William J. POLK, Jr., et al., Objectors
Below, Appellants,

Miriam Gelband and Leo Kayser, III,
Objectors Below, Appellants,

Seagoing Uniform Corporation,
Objector Below, Appellant,

Mollie Pin, Objector Below, Appellant,

Mandel, Lipton & Stevenson Profit
Sharing Plan, Objector
Below, Appellant,

v.

Howard GOOD, et al., Plaintiffs
Below, Appellees,

and

Texaco, Inc., et al., Defendants
Below, Appellees.

Supreme Court of Delaware.
Submitted: Oct. 1, 1985.
Decided: March 10, 1986.
Rehearings Denied March 27, 1986.

Thomas G. Hughes of O'Donnell & Hughes, P.A., Wilmington, and Lemoine Skinner, III (argued) of Titchell, Maltzman, Mark, Bass, Ohleyer & Mishel, A.P.C., of counsel, San Francisco, Cal., and Edward K. Fehlig of Ziercher, Hocker, Human, Michenfelder & Jones, of counsel, St. Louis, Mo., for appellants Polk Trustees.

Peter M. Sieglaff and Robert K. Payson of Potter, Anderson & Corroon, Wilmington, Leo Kayser, III (argued), and H. Miles Jaffe of Raggio, Jaffe & Kayser, of counsel, New York City, for appellants Gelband and Kayser.

Victor F. Battaglia and Pamela S. Tikellis of Biggs & Battaglia, Wilmington, Sidney B. Silverman (argued) and Joan Harnes of Silverman & Harnes and Levy & Sonet, of counsel, New York City, for appellants Seagoing Uniform Corp.

Victor Battaglia and Pamela S. Tikellis of Biggs & Battaglia, Wilmington, Lowell E. Sachnoff (argued), Charles R. Watkins and Barbara F. Wolf of Sachnoff, Weaver & Rubenstein, Ltd., of counsel, Chicago, Ill., and William C. Garrett, of counsel, Dallas, Tex., for appellant Mollie Pin.

Thomas G. Hughes of O'Donnell & Hughes, P.A., Wilmington, and Marshall Patner (argued) of Orlikoff, Flamm & Patner, of counsel, Chicago, Ill., for appellant Mandel, Lipton & Stevenson Profit Sharing Plan.

Joseph A. Rosenthal (argued) and Kevin Gross of Morris & Rosenthal, P.A., Wilmington, for plaintiffs-appellees.

R. Franklin Balotti of Richards, Layton & Finger, Wilmington, George M. Newcombe (argued), Roy L. Reardon and Mary Elizabeth McGarry of Simpson, Thacher & Bartlett, of counsel, New York City, and Dee J. Kelly of Kelly, Appleman, Hart & Hallman, of counsel, Fort Worth, Tex., for Bass appellees.

Rodman Ward, Jr. (argued), David J. Margules and Thomas P. White of Skadden, Arps, Slate, Meagher & Flom, Wilmington, and Eric M. Roth of Wachtell, Lipton, Rosen & Katz, of counsel, New York City, for individual Texaco appellees.

Before McNEILLY, HORSEY and MOORE, JJ.

MOORE, Justice:

■ Appellants, shareholders of Texaco, Inc., appeal a decision of the Court of Chancery approving the settlement and dismissal of these consolidated stockholders' class and derivative actions against Texaco, its board of directors, and several investors known collectively as the Bass Brothers group (the Bass group or Bass). The settlement disposed of claims challenging Texaco's repurchase at a premium of the Bass group's Texaco stock. The appellants, who either moved to intervene in the consolidated suit or objected to its termination, seek reversal on the ground that the Chancellor abused his discretion in approving the settlement. They base this on the following: (1) the current validity of certain Delaware case law, and the Chancellor's interpretation and application of that law; (2) the alleged lack of valid consideration for the settlement; (3) the alleged interest on the part of the Texaco directors; (4) the alleged insufficiency of the settlement notice; and (5) the factual bases upon which the Chancellor rested his approval. Given our scope of review, abuse of discretion below, we find no merit to appellants' contentions, and affirm the decision of the Court of Chancery.

## I.

The nature of this appeal requires a somewhat detailed discussion of the facts.

### A.

*The Bass Group's Purchases, the Getty Acquisition and Texaco's Buyout.*

In 1982, the Bass group began buying shares of Texaco, and by the end of 1983 had acquired almost 5% of the corporation's outstanding common stock. During this period Bass had urged Texaco to acquire shares of its own stock by either a self-tender or open market purchases. Texaco rejected the idea, but relations between the parties remained cordial. There was no indication that Bass was pressuring the corporation to act.

In January 1984, Texaco became involved in one of the biggest corporate acquisitions in history, when it bought Getty Oil Company (Getty) at a cost of over $10 billion. The Texaco management was consumed with such tasks as obtaining government and shareholder approval of the transaction, selling off expendable assets to refinance the debt incurred, integrating the two huge companies, and dealing with the inevitable litigation.

While Texaco was acquiring Getty, the Bass group continued buying Texaco stock on the open market, and by January 30, it held about 9.9% of the corporation's outstanding shares. Bass also kept urging Texaco to repurchase its own shares. Moreover, the group indicated that it might obtain up to 20% of Texaco, hinting at a possible tender offer. Rumors appeared in the financial press that the Bass group would join with Pennzoil, an adversary of Texaco in the Getty acquisition, to break up Texaco and force a divesture of Getty. All of this concerned Texaco, which, in the midst of the Getty acquisition, would be vulnerable in warding off a hostile shareholder group whose actions might be con-

trary to the best interests of a majority of the company's stockholders. Although the Bass group was still openly supportive of existing Texaco policy, both the management and the financial community expected Bass to maximize its financial advantage at this critical time.

On February 28, the Bass group suggested a joint venture with the company which would combine some Texaco shares and real estate assets of the Bass group with certain oil reserves of Texaco. Corporate management studied and rejected the plan, considering it nothing more than a means for Bass to realize $68 per share for its stock, a value which greatly exceeded Texaco's market price, and one which management considered excessive. Fearing that rejection of the proposal would trigger some hostile Bass move, Texaco consulted its investment banker, The First Boston Corporation, and its outside corporate counsel. The company and its advisors all concluded that a substantial immediate threat to the corporation's best interests existed, and that the most effective way of meeting the danger was to acquire the Bass stock.

The parties opened negotiations for a repurchase. Bass initially sought $68 per share, but eventually dropped its price to an "absolute bottom" of $55. Texaco's chairman, John K. McKinley, announced a top purchase price of $50. On March 5, the parties reached an agreement in principle for a sale at $50 per share, representing a premium of $1⅝ over $48⅜, the market price on March 2, the previous trading day. The Bass group was to receive one half of the proceeds in cash. The other half would be in the form of a new issue of preferred stock with voting rights, similar to the common, in order to provide tax benefits and assurance of the new securities' marketability for the group. However, because one of the reasons behind the repurchase was to prevent a disruption of Getty's assimilation into Texaco, the Bass group volunteered, after the price for its stock was set, to vote the preferred shares as the

Texaco board directed. This offer was accepted.

On March 6, the proposal was submitted to the Texaco board, 10 of whose 13 members were outside directors. First Boston informed the board that the premium was reasonable and at the low end of the range other companies were paying in similar transactions, and that the $50 price was consistent with the long-term value of the company. Texaco's legal counsel advised that the corporation had the power to repurchase the shares, and that such action would be protected under Delaware's business judgment rule. The directors unanimously approved the repurchase. The Bass group received approximately $650 million in cash and 12.6 million shares of the preferred voting stock, which now comprised about 5% of the total voting power of Texaco's outstanding shares. The sellers agreed not to acquire any more Texaco stock for a period of ten years, during which time they would vote their shares in accordance with the board's recommendations.

### B.

### The Subsequent Suits.

Plaintiffs, Howard Good *et al.*, filed a total of 21 suits attacking the repurchase. Fifteen of these actions were filed in the Court of Chancery and thereafter consolidated in this proceeding. The complaints basically charged that (1) the price was excessive, (2) the repurchase constituted a gift of assets, (3) no legitimate corporate purpose was served, (4) the transaction was an impermissible vote-buying scheme, (5) there was an improper object, to entrench Texaco's board, (6) the distribution was a prohibited partial liquidating dividend to the Bass group, and (7) all of this constituted a breach of fiduciary duty by the Texaco directors, aided and abetted by the Bass group. Plaintiffs sought to rescind the transaction, to either enjoin the annual stockholders' meeting or set aside the vote to be taken, and to enjoin exercise of the voting power of the preferred stock, as

well as money damages, attorneys' fees, and costs.

After a motion to dismiss was denied, Texaco and the Bass group amended the repurchase agreement to provide that the latter's shares would not be controlled by the Texaco board, but would be voted proportionately to all the votes cast by Texaco's common shareholders. With the Bass voting power thus neutralized, plaintiffs agreed not to seek an injunction of the stockholder vote at the annual meeting scheduled for May 25.

Plaintiffs took extensive discovery, including an inspection of documents and the oral depositions of various key individuals, such as McKinley of Texaco and Sid Bass, who represented the sellers in the repurchase negotiations. When plaintiffs' discovery was complete, their lawyers concluded that no additional relief was likely beyond the modification of the voting agreement. Plaintiffs' counsel reasoned that if the case went to trial, they could not overcome the presumption of the business judgment rule as to the issues remaining. The defense position throughout the course of these suits was that neither management nor the Texaco board had acted contrary to the best interests of the shareholders.

Thus, the suits were settled on the basis of the voting agreement modification, which removed the board's power to direct the shares' vote. In addition, the defendants agreed to provide the stockholders and class members with all the necessary information relevant to the transaction, suit, and settlement by disclosing the discovery materials. The defendants also agreed to pay $700,000 in attorneys' fees, plus litigation expenses. After careful review, the Court of Chancery approved the settlement and dismissed the actions with prejudice. All motions for leave to intervene were denied.

## II.

The Chancellor noted that Delaware law favors the voluntary settlement of contested issues, citing *Rome v. Archer*, Del. Supr., 197 A.2d 49 (1964). Under *Rome*, the court's function is to consider the nature of the claim, the possible defenses thereto, the legal and factual circumstances of the case, and then to apply its own business judgment in deciding whether the settlement is reasonable in light of these factors. *Id.* at 53. The Chancellor observed that the principal defense here was that a corporation may acquire its own stock under 8 *Del.C.* § 160,[1] and that the business judgment rule would almost certainly protect such action. The Chancellor also recognized that the standard applicable to the defendants' conduct was "good faith, reasonable investigation, and arguable justification." *Good v. Texaco*, Del.Ch., C.A. No. 7501, slip op. at 32, Brown, C. (February 19, 1985).

In applying this test to the defense here, the Chancellor noted: (1) the lack of self interest on the part of Texaco's board, 10 of whose 13 members were outside directors; (2) the advice given the board by its investment banker and counsel; (3) the disruptive effect a hostile takeover attempt would have on Texaco in light of the administrative complexities generated by the Getty acquisition; and (4) that the facts of the case did not indicate any vote-buying intent by Texaco. While not making any findings *per se*, the court took note of these factors and decided that in the event of a trial the directors stood a better than even chance of winning, with the plaintiffs having a very difficult task in overcoming the protections of the business judgment rule. Thus, in applying his own business judgment the Chancellor concluded that the settlement was in the best interests of all concerned. Accordingly, he overruled ap-

---

**1.** The pertinent provision of the statute is:
(a) Every corporation may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares; 8 *Del.C.* § 160(a).

pellants' objections to the settlement and denied the various motions to intervene.

### III.

### A.

Here, our standard of review is whether under all the facts and circumstances the Chancellor abused his discretion. *Rome v. Archer*, Del.Supr., 197 A.2d 49 (1964); *Neponsit Inv. Co. v. Abramson*, Del.Supr., 405 A.2d 97 (1979). When a settlement has been approved as fair and reasonable we must find the evidence so strongly to the contrary as to amount to an abuse of discretion. *Rome*, 197 A.2d at 54. While we have the authority to review the entire record and make our own findings of fact in a proper case, we do not ignore the findings and conclusions of the trial judge. If they are supported by the record and are the product of an orderly and logical deductive process, they will be accepted. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

In examining a settlement, the Chancellor need not try the case. Indeed, he is not required to decide any of the issues on the merits. *In re Ortiz' Estate*, Del. Ch., 27 A.2d 368, 374 (1942); *Perrine v. Pennroad Corporation*, Del.Supr., 47 A.2d 479, 488 (1946). Instead, he looks to the facts and circumstances upon which the claim is based, the possible defenses thereto, and then exercises a form of business judgment to determine the overall reasonableness of the settlement. *Rome v. Archer*, 197 A.2d at 53–54. The considerations applicable to such an analysis include: (1) the probable validity of the claims, (2) the apparent difficulties in enforcing the claims through the courts, (3) the collectibility of any judgment recovered, (4) the delay, expense and trouble of litigation, (5) the amount of the compromise as compared with the amount and collectibility of a judgment, and (6) the views of the parties involved, pro and con. *In re Ortiz' Estate*, 27 A.2d at 374; *Perrine v. Pennroad Cor-*

*poration*, Del.Supr., 47 A.2d 479, 488 (1946); *Krinsky v. Helfand*, Del.Supr., 156 A.2d 90, 94 (1959). However, as noted in *Rome*, our review is more limited than that of the Court of Chancery. It is not our function to determine the intrinsic fairness of the settlement or to exercise our own business judgment respecting its merits. We limit ourselves solely to the question of an abuse of discretion by the trial court in exercising its business judgment. *Rome v. Archer*, 197 A.2d at 54.

### B.

Before addressing the plaintiffs' specific claims and the defenses thereto, we begin with certain basic principles applicable here. Under Delaware law the business and affairs of a corporation are managed by and under the direction of its board of directors. *See* 8 *Del.C.* § 141(a). In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders. *Guth v. Loft, Inc.*, Del. Supr., 5 A.2d 503, 510 (1939); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 811 (1984). Subject to certain well defined limitations, a board enjoys the protection of the business judgment rule in discharging its responsibilities. The rule creates a presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation." *Aronson v. Lewis*, 473 A.2d at 812.

A Delaware corporation has the power to deal in its own stock, 8 *Del.C.* § 160(a) [2], and may acquire a dissident's shares provided the transaction is free from fraud or unfairness. *Kors v. Carey*, Del. Ch., 158 A.2d 136 (1960). Unless the primary or sole purpose was to perpetuate the directors in office, such an acquisition will be sustained if, after reasonable investigation, a board has a justifiable belief that there was a reasonable threat to the

---

**2.** See n. 1, *supra.*

corporate enterprise. *Unocal Corporation v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 953–55 (1985); *Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554, 556 (1964); *compare Bennett v. Propp*, Del.Supr., 187 A.2d 405 (1962). When properly accomplished, such matters are protected by the business judgment rule. *Unocal* 493 A.2d at 954; *Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 627 (1984).

■ However, as we noted in *Unocal*, a company repurchasing its shares to eliminate a perceived danger must meet certain threshold standards to come within the ambit of the business judgment rule. The first problem is a potential conflict of interest. Thus, in *Unocal* we held that:

[i]n the face of this inherent conflict directors must show that they had reasonable grounds for believing that a danger to corporate policy existed because of another person's stock ownership ... However, they satisfy that burden "by showing good faith and reasonable investigation ..." ... Furthermore, such proof is materially enhanced as here, by the approval of a board comprised of a majority of outside independent directors who have acted in accordance with the foregoing standards. *Unocal*, 493 A.2d at 955.

Finally, the board's action must be reasonable in relation to the threat posed, based on an analysis of the perceived danger and its effect on the corporation and its stockholders. *Id.*

■ Here, the presence of the 10 outside directors on the Texaco board, coupled with the advice rendered by the investment banker and legal counsel, constitute a *prima facie* showing of good faith and reasonable investigation. *See Moran v. Household International, Inc.*, Del.Supr., 500 A.2d 1346, 1356 (1986); *see also, Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872–73 (1985). With 10 of the 13 directors being independent, the plaintiffs thus bore a heavy burden of overcoming the presumptions thus attaching to the board's decisions. *Unocal* 493 A.2d at 955; *Aronson v. Lewis*, 473 A.2d at 812, 815; *Puma v. Marriott*, Del. Ch., 283 A.2d 693, 695 (1971).

The events occurring from the outset of the Bass group's acquisition of Texaco stock, up to the repurchase, created reasonable grounds for a justifiable belief by the directors that there was a threat to Texaco. The payment of a premium of approximately 3% over market seems reasonable in relation to the immediate disruptive effect and the potential long-term threat which the Bass group posed. Clearly, that was a benefit to the company and most of its stockholders.

### IV.

Thus, we turn to the various challenges of the objectors.

#### 1. *The law governing the repurchase.*

Appellants contend that *Kors, Cheff,* and *Bennett v. Propp*, should not be interpreted to permit "greenmail," and should be limited to those instances where dissident shareholders threaten to interfere with the day-to-day business operations of a company.[3] They argue that these cases do not sanction the repurchase at a premium of shares of those who threaten such activities as proxy fights and tender offers—the exercise of legitimate corporate "democratic processes". However, our recent decision in *Unocal* completely rejects that thesis, and we need not repeat it here. *Unocal*, 493 A.2d at 953–55. The Chancellor's conclusions were entirely consistent with the principles stated in *Unocal*.

#### 2. *Consideration for the settlement.*

■ Appellant, Seagoing Uniform Corporation (Seagoing), argues that the plaintiffs received insufficient consideration for

---

**3.** As we observed in *Unocal*, the term "greenmail" refers to the practice of buying out a takeover bidder's or dissident's stock at a premium that is not available to other shareholders. *Unocal*, 493 A.2d at 956, n. 13.

the settlement. It is claimed that the voting rights modification fails as present consideration for the accord, because the change was already a *fait accompli* when the parties agreed to settle. Seagoing contends that this case is analogous to *Chickering v. Giles*, Del. Ch., 270 A.2d 373 (1970), where the Court of Chancery rejected a settlement after the issues had been rendered moot by the parties.

However, there are several problems with that argument. Validity of a settlement does not depend on every compromised claim in a lawsuit being supported by independent consideration. *Manacher v. Reynolds*, Del. Ch., 165 A.2d 741, 747–48 (1960). Here, the thrust of the allegations was that the repurchase was an illegal vote-buying scheme. Plaintiffs sought to enjoin the May 25 shareholders meeting and the board's control of the Bass group's vote. After the complaint was filed, but before the May 25 meeting, the voting provision of the repurchase agreement was modified so that the Bass shares would be voted proportionately to those of all Texaco common stockholders. This followed defendants' unsuccessful motion to dismiss.

While *Chickering* holds that a court may refuse to approve a settlement which has been rendered moot by the actions of the parties, that decision also recognizes that there may be cases where action is compelled before a court can give notice of or hold a hearing on a settlement petition. *Chickering v. Giles*, 270 A.2d at 375. Here, the parties actually stipulated in advance of the stockholders' meeting that Texaco would relinquish its right to direct the vote of the Bass stock. In return the plaintiffs agreed that the scheduled meeting would proceed free from injunction or challenge. From this the Chancellor could reasonably infer that the modification was causally related to the lawsuit. In the exercise of his discretion he could take due account of this in approving the settlement and its resultant benefits. *See Allied Artists Pictures Corp. v. Baron*, Del.Supr., 413 A.2d 876, 878 (1980). Finally, this case does not present the sort of abuse of the settlement process which *Chickering* addressed.

Seagoing further argues that disclosure of the discovery materials is insufficient consideration, because class members are entitled to such information anyway. However, the defendants respond that the consideration lies in Texaco's providing the information in an accessible form as opposed to forcing stockholders to go to Delaware in order to sift through discovery documents. It is unclear from the Stipulation of Compromise and Settlement whether Texaco must itself actually disseminate this material. However, the value of the discovery materials notwithstanding, we find that the modification of the voting provision constituted sufficient consideration under these circumstances for the settlement.

### 3. *The directors' alleged interest.*

The Polk Trustees argue that the board purchased the vote of the Bass group's shares, thereby giving the directors an interest in the stock repurchase and placing upon them the burden of showing the intrinsic fairness of the transaction. However, as we previously noted, the Texaco directors would likely be found to have satisfied the *Unocal* standards in approving the repurchase. Considering that factor, we find no abuse of discretion by the trial court in approving this settlement.

### 4. *The notice of settlement.*

The Polk Trustees also claim that the notice of settlement was inadequate to allow shareholders to make an informed decision regarding intervention. However, notice will suffice when a fair description advises stockholders of their substantial interests which are involved. *Geller v. Tabas*, Del.Supr., 462 A.2d 1078 (1983). We consider that the notice here meets that standard.

**5. The factual bases of the approval.**

Appellant, Mandel, Lipton & Stevenson Profit Sharing Plan, claims that the findings of fact upon which the Chancellor approved the settlement are clearly wrong, thereby entitling this Court to enter its own findings. However, we have reviewed this record, which clearly supports the Chancellor's findings. His conclusions are the obvious product of an orderly and logical deductive process. Under the circumstances it is our duty in the exercise of judicial restraint to affirm. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

**6. Other arguments.**

Several appellants make various other claims on appeal, among them that the objectors should be allowed to proceed with the litigation, and that as fiduciaries of a trust the directors must show purpose or fairness in their actions. Without repeating what we have already said, we are satisfied that in the settlement of these claims the trial court concluded in the exercise of its own business judgment that the Texaco directors have fully met their fiduciary duties. We find no abuse of discretion in that ruling.

### V.

In our opinion the Chancellor properly approved this settlement on the basis of well established principles of law. His findings and conclusions are supported by the record, and absent an abuse of discretion, this Court will not disturb the decision below. Accordingly, the judgment of the Court of Chancery is

AFFIRMED.