## In re The COLEMAN COMPANY, INC. SHAREHOLDERS LITIGATION.

### Civil Action No. 16486.

Court of Chancery of Delaware.

Submitted: Sept. 29, 1999.
Decided: Nov. 12, 1999.
Revised: Nov. 22, 1999.

---

Joseph A. Rosenthal and Norman M. Monhait, of Rosenthal, Monhait Gross & Goddess, P.A., Wilmington, Delaware; of Counsel: Robert I. Harwood, of Wechsler Harwood Halebian & Feffer LLP, New York, New York; Stuart H. Savett, of Savett Frutkin Podell & Ryan, P.C., New York, New York, and Rachell Roffe Sirota, of Sirota & Sirota LLP, New York, New York, Attorneys for Plaintiffs.

Thomas J. Allingham II, Richard L. Easton, Matthew M. Greenberg, and Kevin M. Maloy, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware, Attorneys for Defendants.

Michael Hanrahan and Paul A. Fioravanti, of Prickett, Jones, & Elliott, Wilmington, Delaware, Attorneys for Objector Mentor Partners.

## OPINION

### CHANDLER, Chancellor.

The parties to this shareholders class action seek approval of a proposed settlement under Chancery Court Rule 23(e). Filed on behalf of the public shareholders of The Coleman Company, Inc. ("Coleman" or the "Company"), the action asserts claims arising from events following the Sunbeam Corporation's agreement to acquire the public shareholders' 19% interest in Coleman. The settlement contemplates that this action will be certified under Court of Chancery Rules 23(a) and 23(b)(1) and (2), with no right to opt out for objecting class members. Because plaintiffs primarily seek injunctive relief as to which all members of the class are similarly situated or, in the alternative, money damages as to which all members of the class would again be identically situated, use of the (b)(2) class mechanism is appropriate.[1]

On the afternoon before the settlement hearing, Mentor Partners ("Mentor"), holder of 8% of Coleman's outstanding publicly held shares, objected to the proposed settlement. Although Mentor seems to object to certain aspects of the merger transaction itself, which was never a subject of litigation, its primary disquiet concerns the alleged paucity of the settlement consideration, the scope of released claims and parties, and the allegedly excessive fee award requested by class counsel.

It is now incumbent upon this Court to protect the interests of absent class members who will be barred from future litigation of claims asserted against certain named and unnamed defendants released in the settlement. This responsibility requires the Court to exercise judgment with respect to the strengths and weaknesses of the claims asserted by the plaintiffs and the benefits conferred by the settlement. In so doing, the Court must determine whether the proposed settlement is fair, adequate and reasonable.[2]

## I. FACTUAL BACKGROUND

Because this is the first substantive motion filed with the Court in this matter, it will be helpful to set forth a brief factual history of the transactions and events giving rise to this short-lived litigation.

### A. Sunbeam's Two–Step Acquisition of Coleman

On February 27, 1998, Sunbeam entered into separate merger agreements with two distinct groups of Coleman shareholders— MacAndrews & Forbes, Inc. ("M & F"), holder of approximately 81% of Coleman's outstanding equity (the "M & F Merger"), and a disaggregated group of Coleman's public shareholders, owner of the rump 19% (the "Public Merger").

Under the Public Merger, M & F, as an 81% shareholder, and Coleman's M & F designated board of directors, agreed to merge the public shareholders' 19% interest in the Company with a Sunbeam subsidiary. According to the M & F Merger, the remaining 81% of Coleman's outstanding equity held by M & F was also merged with a Sunbeam subsidiary. At the close of both transactions, Coleman would be-

---

1. *Nottingham Partners v. Dana,* Del.Supr., 564 A.2d 1089, 1098–1100 (1989); *Raskin v. Birmingham Steel Corp.,* Del. Ch., C.A. No. 11365, 1990 WL 193326, Allen, C. (Dec. 4, 1990); *Joseph v. Shell Oil Co.,* Del. Ch., C.A. No. 7450, Hartnett, V.C. (Feb. 8, 1985).

2. *Rome v. Archer,* Del.Supr., 197 A.2d 49, 53–54 (1964); *Polk v. Good,* Del.Supr., 507 A.2d 531, 536 (1986).

come a wholly-owned subsidiary of Sunbeam.

The day the merger agreements were entered into, essentially identical merger consideration flowed to M & F and the public shareholders, though M & F had a larger cash component.[3] These transactions, however, are not the subject of this litigation. Rather, events occurring shortly after the parties entered into the merger agreements gave rise to the public shareholders' alleged injuries.

### B. *Subsequent Events*

On March 30, 1998, the M & F Merger was consummated and the Coleman board comprised of M & F designees resigned. Sunbeam, as the new controlling shareholder, appointed a new five-person board of directors for Coleman (the "March 30 Coleman Board").[4] Before executing the M & F Merger, however, the M & F affiliate, as then-owner of 81% of the Company's outstanding shares, executed a written consent approving the Public Merger.

A few days after the M & F Merger was consummated and the M & F affiliate approved the Public Merger, Sunbeam issued a press release announcing that its first quarter sales would be 5% lower than the previous year's first quarter and that due to lower sales and significant one-time charges, a loss was expected for the quarter. By the end of the month, shareholders and plaintiffs lawyers smelled accounting fraud and disclosure problems and filed the first of several lawsuits alleging violations of federal securities laws in the United States District Court for the Southern District of Florida (the "Florida Litigation").[5]

Over the course of the next month and a half, as a result of the allegations of financial impropriety, the price of Sunbeam's stock declined precipitously. When the dust settled, Sunbeam's share price had declined approximately 50% from its March 4, 1998 high of $53. Thus, in a very short period, the merger consideration flowing to Coleman's public shareholders had decreased from approximately $30 per share to $21 per share. Sunbeam's share price continued to slide and by September 17, 1999, two weeks before the settlement hearing, the public shareholders' merger consideration had declined to approximately $10 per share.[6]

On June 6, 1998, Albert J. Dunlap and several directors and officers aligned with him were removed from Sunbeam's board and management team. By June 15, M & F personnel filled the management vacuum left in Dunlap's wake, taking two Sunbeam board positions and assuming the day-to-day control of Sunbeam's affairs.

Shortly after M & F took control of the beleaguered Sunbeam, Sunbeam's board formed a special committee of directors, independent of both Sunbeam and M & F, to negotiate and settle M & F's claims arising out of the M & F Merger. On August 12, 1998, M & F and Sunbeam executed a settlement agreement.

### C. *Coleman Public Shareholders Litigation*

Beginning June 25, 1998, five class action lawsuits were filed in this Court in

---

**3.** In the Public Merger, shareholders will exchange each of their Coleman shares for $6.44 in cash and 0.5677 Sunbeam shares. In the M & F Merger, M & F exchanged each of its Coleman shares for approximately $15 in cash and debt assumption plus 0.32 Sunbeam shares. Using Sunbeam's market price on February 27, the value of the two transactions was within pennies.

**4.** The March 30 Coleman Board was comprised of Albert J. Dunlap (Sunbeam and Coleman director), Charles M. Elson (Sunbeam and Coleman director), Peter A. Langerman (Sunbeam and Coleman director), David C. Fannin (Sunbeam officer and Coleman director) and Russell A. Kersh (Sunbeam officer and Coleman director).

**5.** *See In re Sunbeam Securities Litigation,* 89 F.Supp.2d 1326 (S.D.Fla.1999).

**6.** M & F's merger consideration has also drastically declined, though less than the public's as a result of M & F's larger cash component.

connection with the Public Merger. In the consolidated suit, the shareholder plaintiffs named Coleman, Sunbeam and, individually, the five members of the March 30 Coleman Board as defendants. Plaintiffs did not name M & F or members of Coleman's M & F designated board in their consolidated complaint.

The class action complaint alleged that by refusing to terminate or renegotiate the Public Merger, Sunbeam and the March 30 Coleman Board breached fiduciary duties owed to Coleman's public shareholders. More particularly, plaintiffs argued that because members of the March 30 Coleman Board were designees and indeed insiders of Sunbeam, conflicts of interest caused them to place Sunbeam's interests ahead of the Coleman shareholders, to whom they owed fiduciary duties.

Plaintiffs also argued that as majority shareholder of Coleman, Sunbeam owed the minority fiduciary duties. By cramming down a transaction on them for what was manifestly unfair and inadequate consideration, plaintiffs argued, Sunbeam breached such duties. In light of Sunbeam's control position, plaintiffs believed that the Public Merger transaction should have been scrutinized under the entire fairness standard, a standard which, they argued, defendants surely could not have met.

## II. ANALYSIS

■ When reviewing proposed settlements, this Court considers six factors particularly helpful: (1) probable validity of the claims, (2) apparent difficulties in enforcing the claims through the courts, (3) the collectibility of any judgment recovered, (4) the delay, expense and trouble of litigation, (5) the amount of the compromise as compared with the amount and collectibility of a judgment, and (6) the views of the parties involved, pro and con.[7] In this instance, the third and fifth factors concerning the practical benefits of any relief (legal or equitable) granted are instructive. First, however, I turn to the validity of plaintiffs' claims.

### A. Validity of Claims

■ When litigants move to settle a case in which neither party has filed a dispositive motion, the plaintiff is charged with the awkward task of rebutting its own claims. The Court, of course, finds itself in the even more awkward position of having to evaluate plaintiff's rebuttal of its own claims.

In this instance, according to plaintiffs' settlement brief, defendants would have argued that neither Sunbeam nor the March 30 Coleman Board carried the burden of establishing entire fairness because (1) the unaffiliated directors of Coleman approved the transaction before Sunbeam became the majority owner of Coleman; (2) in approving the transaction, the unaffiliated directors of Coleman were advised by sophisticated independent financial and legal advisors; and (3) the transaction was negotiated before the defendants became directors of Coleman.[8] Defendants would have further argued that since the Public Merger agreement did not have a "fiduciary out" termination clause, the March 30 Coleman Board did not have the legal option to terminate it.[9]

---

7. *Polk v. Good,* 507 A.2d at 536.

8. Plaintiffs cite *Kahn v. Tremont,* Del.Supr., 694 A.2d 422, 429 (1997) and *Citron v. E.I. Du Pont de Nemours & Co.,* Del. Ch., 584 A.2d 490 (1990) for the proposition that Sunbeam and the March 30 Coleman Board did not bear the burden of establishing entire fairness because the Public Merger was negotiated by an entity unaffiliated with and independent of Sunbeam and the March 30 Coleman Board.

9. Whether or not the March 30 Coleman Board had the legal option to terminate the Public Merger is largely beside the point as, at a minimum, they had the practical option of effectuating an efficient breach of the Public Merger Agreement. Moreover, it is doubtful that Sunbeam would have much cause to cry foul and claim breach of a contract it likely first breached itself.

Plaintiffs' settlement brief indicates that defendants would characterize the Public Merger as a *fait accompli* that was negotiated and executed by a board of directors and approved by an 81% shareholder who were unaffiliated with Sunbeam and the March 30 Coleman Board. In light of these facts, the final leg of the argument goes, the Public Merger agreement was no longer executory and could not be terminated or amended according to its terms. Plaintiffs state that defendants' prospective arguments would have constituted formidable defenses to their claims against Sunbeam and the March 30 Coleman Board.

Plaintiffs afford more weight to these defenses than seems appropriate. It is far from clear that because M & F and Coleman's M & F designated board purportedly executed the Public Merger that a court would relieve Sunbeam and the March 30 Coleman Board from exercising a fiduciary's judgment as to whether to consummate the Public Merger and under what terms. In my view, plaintiffs raised several colorable claims that might well have survived a motion to dismiss, if not beyond.

### B. Collectibility of Potential Judgment

Certain unfortunate circumstances, however, vitiate the strength of plaintiffs' potential recovery as a practical matter. In light of Sunbeam's precarious financial condition, even the objector acknowledges that a suit for money damages, whether predicated on fraud, breach of contract or breach of fiduciary duty grounds, might not yield happy results for the public shareholders. Even if plaintiffs prevailed and obtained a judgment, they would face the likely eventuality of appearing in a long queue of unsecured creditors confronting the prospect of a court awarded judgment worth even fewer pennies on the

dollar than the proposed settlement consideration.[10] The still pending Florida litigation and lingering doubt over the applicability of director and officer insurance, indeed, worsens this bleak scenario.

Likewise, injunctive relief is unappealing because terminating the Public Merger would have bestowed upon plaintiffs the dubious distinction of being a 20% minority in a Sunbeam controlled subsidiary, subject to the whims of Sunbeam and its creditors. Facing such a prospect, a board of directors might well have decided that the Coleman public shareholders were better off with the more liquid Sunbeam stock than with the Coleman stub.

### C. Fairness Analysis

The key referent plaintiffs employed to assess the fairness and value of their settlement was the settlement terms negotiated by M & F with respect to claims arising out of the M & F Merger.[11] Settlement negotiations between M & F and Sunbeam commenced shortly after plaintiffs filed suit. The Sunbeam board appointed four outside directors, none of whom had any affiliation with M & F, to an independent special committee, assisted by its own outside counsel and financial advisors.

Complicating the M & F—Sunbeam settlement discussions was the fact that executive personnel affiliated with M & F had been managing Sunbeam for approximately two weeks before settlement discussions commenced. Sunbeam appeared quite eager to maintain their presence and insisted that M & F continue to provide management assistance and other support. Plaintiffs assert that this situation gave M & F significant leverage in its settlement negotiations.

In exchange for a general release of all claims against Sunbeam and continued

10. No doubt the slim prospects for recovery is the reason class counsel reported at the settlement hearing that several significant shareholders had expressed approval of the this settlement as "the best they could hope for."

11. Presumably, M & F asserted contract-based claims arising out of the M & F Merger Agreement in its settlement negotiation.

management assistance, Sunbeam issued to M & F five-year warrants to purchase 23 million additional shares of Sunbeam common stock at an exercise price of $7.00 per share, with anti-dilution protection ("the M & F Warrants").[12]

The parties' proposed settlement grants plaintiffs warrants to purchase 4.98 million Sunbeam shares with the same exercise price, expiration date, and anti-dilution protection as the M & F Warrants. Unlike the M & F Warrants, the public shareholders' warrants will enjoy some degree of immediate liquidity as they are exempt from registration under the Securities Act of 1933. Using the Black–Scholes option-pricing model,[13] plaintiffs' expert values the warrants at $2.475 each, for an aggregate value of $12,324,592. The objector does not challenge this valuation.

Plaintiffs argue that the Court should now approve the settlement because they achieved the same terms as M & F, essentially pointing to the terms of the M & F settlement as indicia of fairness and reasonableness. Plaintiffs also purport to have accomplished the same deal despite enjoying less bargaining power insofar as they could not leverage the provision of key management personnel in order to obtain more favorable settlement terms.

Although the dollar amount of plaintiffs' loss is significantly higher than $12.3 million, I believe the settlement consideration nevertheless confers a real benefit upon plaintiffs. Thus, even though plaintiffs raise colorable claims, the delay, expense, and trouble of litigation coupled with serious collectibility problems seem to justify the proposed settlement agreement.

## III. MENTOR'S OBJECTIONS

### A. *Objections to Merger*

Mentor's first objection does not address the settlement, but, rather, the underlying transaction giving rise to the settlement. Mentor argues that by negotiating a larger stock component in the Public Merger than in the M & F Merger, M & F and Coleman's M & F designated board injured the public shareholders.

On February 27, 1998, the date the parties entered into the merger agreements, nearly identical consideration flowed to the public shareholders and M & F. In fact, in the days immediately after the companies announced the transactions, Sunbeam stock traded higher. Thus, for a time, albeit brief, it appeared that the public

---

**12.** The M & F Warrants are not registered under the Securities Act of 1933 and are not freely tradeable.

**13.** The Black–Scholes option-pricing model is a standard model used by analysts for pricing options. Fisher Black and Myron Scholes, the developers of the model, won Nobel Prizes in economics following the development of the model. The existence of variables (the risk free rate, volatility of the underlying stock, expiration date of the option, etc.) may cause the model to have less reliability, however, in certain circumstances. Still, Black–Scholes is the leading option pricing model, and I accept it for purposes of assessing the benefit achieved in the settlement of this class litigation. In other circumstances, I have been reluctant to accord too much weight to a Black–Scholes calculation when determining the significance of the benefit in a class action settlement, as its use in that setting may be for the purpose of influencing the magnitude of fees awarded to class counsel.

See *Rovner v. Health–Chem Corp.*, Del. Ch., C.A. No. 15007, Chandler, C., 1998 WL 227908 *5 (April 27, 1998). As the Black–Scholes model was being employed in *Rovner* to justify a higher fee award, I thought then (and do today) that the Court should approach its conclusions in that context, somewhat skeptically or conservatively. I take no position today (as I need not), however, on the model's reliability or legal significance in other corporate law contexts. *Compare Lewis v. Vogelstein*, Del. Ch., 699 A.2d 327 (1997) (questioning whether omission of Black–Scholes calculation from proxy statement was material) *with In re 3COM Corp. Shareholders Litigation*, Del. Ch., C.A. No. 16721, Steele, V.C., 1999 WL 1009210 (Oct. 25, 1999), mem. op. at 16 (concluding there was no substantial likelihood that a reasonable person would consider Black–Scholes option pricing information important in deciding how to vote on proposed amendment to a company's director stock option plan).

shareholders' merger consideration was superior to M & F's.

Not even the objector seriously argues that M & F had any reason to know of Sunbeam's imminent financial reporting debacle. Had it known, M & F surely would not have done the deal or, at a minimum, would have included price collar provisions in its merger agreement to protect it from extraordinary declines in Sunbeam's stock price. Alternatively, M & F simply would not have accepted Sunbeam stock as consideration.[14] Although unfortunate in hindsight, the fact that the Public Merger had a larger stock component and the exchange ratio lacked price collars is of no legal moment.

### B. *The Settlement Consideration is Inadequate*

Contrary to plaintiffs' contentions, Mentor believes that the proposed settlement compares quite poorly with the M & F settlement. Mentor first argues that M & F received twice as much settlement consideration (*i.e.*, twice as many warrants per Sunbeam share) than the public. Though technically accurate, this characterization is subject to criticism.

Under the M & F settlement, M & F received warrants to purchase 23 million Sunbeam shares. In the M & F Merger agreement, M & F received 14 million Sunbeam shares. This yields a ratio of 1.6 warrants for each Sunbeam share received in the merger.

In contrast, the public shareholders are to receive 4.98 million Sunbeam warrants for each of the 6.68 million Sunbeam shares contemplated in the Public Merger agreement. This yields a warrant to share ratio of 0.75. Thus, Mentor argues that under the proposed settlement, the public shareholders are to receive less than half of what M & F received in its settlement, *i.e.*, 1.6 warrants per share for M & F

versus 0.75 warrants per share for public shareholders.

Plaintiffs call this sophistry. The proper basis for comparing M & F's and the public's settlement consideration, argue plaintiffs, is to examine the number of warrants the public is to receive, 4.98 million, with the number received by M & F pursuant to its settlement, 23 million. This comparison yields a ratio of 0.2165. This ratio is commensurate to the public shareholders' and M & F's respective pre-merger stakes in Coleman of approximately 9.54 million and 44.1 million shares respectively, also yielding a ratio of 0.2165.

In my view, plaintiffs' characterization offers the more legitimate basis for comparison because as indicated above, the larger Sunbeam equity component could have, *ex ante*, cut in the public's favor. Consequently, M & F's and the public's pre-merger holdings are a more appropriate basis for comparing their respective settlement consideration.

Mentor's second argument criticizing the purported parity of the two sets of warrants rings truer. Mentor accurately observes that the M & F Warrants enjoy a five-year term commencing August 1998 and expiring August 2003. While the public's warrants carry the same expiration date, they have yet to be issued. Thus, the public's warrants will only carry a three-to-four-year duration. Although this diminished duration has a material impact on the warrants' value, it is at least partially offset by the fact that the public's warrants will be exempt from registration and thus to some extent liquid.

Finally, I note that while accepting the proposition that the M & F Settlement provides a basis for assessing the fairness and reasonableness of the public shareholders' settlement, by no means must the two settlements be identical. While similar, the two settlements are nevertheless the work of separate negotiations con-

---

14. For an interesting case study of the Sunbeam saga as it bears on contemporary corporate governance issues, *see* Jennifer G. Hill, *Deconstructing Sunbeam—Contemporary Issues in Corporate Governance*, 67 U. Cin. L.Rev. 1099 (1999).

strained by different facts and unique negotiating leverage. Thus, Mentor's complaint that M & F "got more" does not strike me as a legally cognizable claim.

### C. *Inadequate Notice of Settlement*

██ The settling parties sent notice of the September 29, 1999 settlement hearing to Coleman's public shareholders on August 25, 1999. While Rules 23(e) and 23.1 do not specifically address notice requirements with respect to settlement hearings, it is the Court of Chancery's general practice that settling parties provide notice to class members between 30 and 45 days prior to the settlement hearing.[15] In light of the parties' August 25 mailing, I see no grounds for Mentor's objection to notice.

Moreover, I find no grounds for Mentor's objection to the contents of the notice. The Supreme Court has held that notice is sufficient if it provides a fair description and advises class members of their substantial interests involved.[16] The settling parties' August 25 notice certainly achieves this limited objective.

### D. *Scope of Released Claims and Parties*

Mentor next objects to the breadth of plaintiffs' universal release of all claims relating to the transaction and later events. Admittedly, some potential claims that might have been brought are absent from plaintiffs' complaint. Specifically, the plaintiffs did not bring a derivative claim against Sunbeam for breach of contract with respect to certain representation and warranty provisions in the merger agreement that Sunbeam likely violated (such as the accuracy of public filings, compliance with SEC regulations).

Plaintiffs' most likely remedy for breach of contract would have been money damages. As noted before, however, a judgment for damages against a company in serious financial distress often proves an illusory remedy. And if the Court were to grant rescission or injunctive relief terminating the merger, plaintiffs' would find themselves holding a 20% minority stake of a Sunbeam subsidiary whose market price would undoubtedly suffer from Sunbeam's control. Consequently, whether plaintiffs obtain relief directly as a class on breach of fiduciary duty grounds or derivatively pursuant to a breach of contract claim is largely immaterial as both results are problematic on a practical level.

In addition to certain claims never brought in this Court, the proposed settlement releases all federal causes of action plaintiffs might hold as a result of the Public Merger. Though the United States Supreme Court has made clear that a state court has the power to approve certain settlements releasing claims as to which federal courts have exclusive jurisdiction,[17] it is nevertheless vital for this Court to examine the release of federal claims with particular skepticism. Here, my general apprehension about releasing federal claims is assuaged by the fact that there is no pending federal litigation involving Coleman or any Coleman directors.

The proposed settlement also releases claims that could be asserted by class members in the Florida Litigation, but *only* to the extent that such claims arose from a class member's interest in Sunbeam common stock acquired in the Public Merger. This aspect of the release resulted from defendants' concern that a class member who purchased Coleman shares *after* the announcement of the Public Merger and *before* the drop in Sunbeam's stock price might contend that he or she has standing in the federal action as a "de facto purchaser" of Sunbeam stock. Al-

---

**15.** Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate And Commercial Practice In The Delaware Court Of Chancery, § 9–4(e) at 658 (1998).

**16.** *Polk v. Good,* 507 A.2d at 538.

**17.** *Matsushita Electric Indus. Co. Ltd. v. Epstein,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996).

though this aspect of the settlement troubled the Court at first, on further reflection it is not problematic. It is far from clear that plaintiffs here would be able to succeed on this "de facto purchaser" theory, but if they could, the benefit defendants seek through this settlement would be largely for naught. To avoid this risk, the release confirms that the Coleman stockholders will not be given a second opportunity to assert their claims by contending that the conversion of their Coleman stock into Sunbeam stock confers standing upon them to join the federal action. I see nothing unfair about this provision, and Mentor offers no authority or argument to the contrary.

■ Mentor also objects that Coleman shareholders who demand appraisal will still have their non-appraisal claims against defendants released. It complains that the settlement coerces the public shareholders into foregoing their appraisal rights by providing that exercise of those rights will result in the release of their fiduciary duty claims for no consideration. Again, Mentor cites no authority or specific grounds for its objection.

■ This objection also misses the mark. In *Selfe v. Joseph*,[18] the Supreme Court rejected the same argument by a dissenting stockholder who objected to the settlement because dissenting stockholders who did not waive their appraisal right and instead accepted the settlement, "receive[d] 'no benefit' from the settlement."[19] Here, Mentor (like Mr. Selfe in *Selfe v. Joseph*) misunderstands the benefit offered to the public shareholder. Under this settlement, the public shareholders are given the opportunity to waive all claims and appraisal rights in order to receive warrants valued at approximately $2.50 each. This is clearly a benefit resulting from the settlement. As the *Selfe* Court recognized, the election of an alternative remedy under the appraisal statute[20] does not negate the fact that the class of shareholders who have accepted the merger consideration have received a benefit. Mentor has the right to share in the benefit, or to pursue its appraisal right. It does not have the right to collect the benefit, secure a floor value for its interest, and then pursue an appraisal remedy as well.

Similarly, Mentor's coercion argument fails because all Coleman public shareholders are similarly situated—they may seek appraisal if they dissented from the merger or they may accept the settlement's benefit. If dissenters participate in the settlement consideration and also pursue their appraisal claim, the value of the settlement is significantly diminished from defendants' perspective. The outcome urged by Mentor would cut against the policy of this State favoring the reasonable and fair settlement of claims.

Mentor's chief objection to the release's scope, however, concerns a certain party to the transaction that went unnamed as a defendant. Mentor argues that claims should have been brought against the one solvent party involved in this "disaster": M & F. Plaintiffs counter that while suing Ron Perelman, chairman and CEO of M & F, is never far from their minds, this time it just was not feasible. Although I am less troubled than the objector that M & F was never named as a defendant, I am a bit puzzled by the fact that all potential claims against it, and all its affiliates and advisors, are nevertheless to be released under the proposed settlement.

Despite Mentor's palpable ire over M & F's release, it does not offer the Court a single theory under which M & F might be held liable to the public shareholders. And even if it had, it is far from clear that plaintiffs did not hold out the possibility of suing M & F in the course of settlement negotiations. Here, the objector would

---

**18.** Del.Supr., 501 A.2d 409, 410–411 (1985).

**19.** *Id.* at 411.

**20.** 8 *Del. C.* § 262.

have the Court reject a settlement that offers something of real value to class members on the strength of what?—a highly speculative, potential claim against M & F that would be litigated for years. This is surely not the outcome the shareholder class (including Mentor) seeks.

## IV. ATTORNEYS' FEES

■ Class counsel seek 30% of the $12,324,592 settlement fund or $3,697,378. Class counsel will receive the same warrants as the settling shareholders.

■ Fee awards are subject to the same rigorous scrutiny applied to the class action settlement itself. The principal factors the Court considers for purposes of determining fee awards in shareholder suits are (1) the time and effort expended by counsel; (2) the difficulty and complexity of the litigation; (3) the standing and ability of counsel; (4) whether the fees are contingent; (5) the stage at which the litigation ended; (6) whether plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof and; (7) the size of the benefit conferred.[21]

Plaintiffs contend that the seventh factor, size of the benefit conferred, should drive the fee award decision.[22] This was indeed the Court's holding in *In re Metro Mobile*, a case upon which plaintiffs' heavily rely. It is worth noting, however, that the *Metro Mobile* Court found a fee award of 16.67% to be "generous but not unreasonable."[23] Then–Vice Chancellor Berger's characterization of a 16.67% award as generous surely calls into question the reasonableness of today's 30% request.

Furthermore, the other six factors of the fee award analysis also figure importantly in protecting the interests of a class when such interests are no longer aligned with class counsel. In this instance, I will elaborate on the first factor, time and effort expended by counsel, and the fifth factor, the stage at which the litigation ended.

Plaintiffs filed suit June 25, 1998. By October 21, 1998, less than four months after filing, class counsel and defendants entered into a Memorandum of Understanding ("MOU") providing for settlement of the public shareholders' claims. During those intervening months, plaintiffs' counsel reviewed documents and "conducted investigations and evaluations of the facts and law relating to matters set forth in [their complaint]."[24] Plaintiffs' counsel did not take a single deposition; nor did they file or defend a single pre-trial motion. Although class counsel performed confirmatory discovery after the MOU was entered into, which included three depositions, confirmatory discovery in settlement situations is hardly the equivalent of adversarial pre-trial discovery.

While the thought of frivolous discovery and motion practice intended solely to build up a paper trail of filings and logged hours is unappetizing to this Court, I am also reluctant to carve out 30% of a settlement fund for lawyers who appear to have expended a less than heroic measure of time and effort pursuing plaintiffs' claims. What is more, it appears that class counsel largely piggy-backed M & F's negotiation and settlement, essentially mimicking the bargaining position of the settling party that preceded them.

In these circumstances, it is within the Court of Chancery's discretion to reduce class counsel's fee award.[25] Accordingly, I

---

21. *Sugarland Indus. Inc. v. Thomas*, Del. Supr., 420 A.2d 142 (1980); *see also Del. Law. R. Prof. Conduct* 1.5(a).

22. *In re Metro Mobile CTS, Inc. Shareholders Litig.*, Del. Ch., C.A. No. 12300, Berger, V.C. (Aug. 18, 1993).

23. *Id.* at 7.

24. Plaintiffs' Brief in Support of Settlement at 9. Although not a relevant factor under *Sugarland Industries, Inc.*, class counsel notes that they logged 760 hours in achieving the settlement, for an hourly rate of $4865.

25. *See, e.g., Field v. S & C Electric Co.*, Del. Ch., C.A. No. 11175, Berger, V.C., 1990 WL 60644 (May 1, 1990); *In re North Am. Philips*

award class counsel 10% of the settlement fund.

## V. CONCLUSION

Based on all of the foregoing reasons, I find the proposed settlement of this class action to be fair, reasonable and in the best interests of the class. I also award class counsel fees in the amount of 10% of the settlement fund.

Stockholders Litigation, Del. Ch., C.A. No. 9178, Jacobs, V.C., 1987 WL 28434 (Dec. 16, 1987); *In re MAXXAM Group, Inc. Stockhold-* *ers Litigation,* Del. Ch., C.A. No. 8636, Allen, C., 1987 WL 10016 (April 16, 1987).