MARIE RAYMOND REVOCABLE TRUST and Richard and Sharon Brower, as Joint Tenants with Right of Survivorship, Plaintiffs,

v.

MAT FIVE LLC, Municipal Opportunity Fund Five LLC, Citigroup Inc., Citigroup Alternative Investments LLC, Citigroup Fixed Income Alternatives, and Reaz Islam, Defendants.

C.A. No. 3843–VCL.

Court of Chancery of Delaware.

Submitted: Dec. 15, 2008.
Decided: Dec. 19, 2008.

Joseph A. Rosenthal, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Samuel H. Rudman, Esquire, Robert M. Rothman, Esquire, Coughlin Stoia Geller Rudman & Robbins LLP, Melville, New York; David C. Watson, Esquire, Jonah H. Goldstein, Esquire, John J. Rice, Esquire, Shannon M. Matera, Esquire, Eric I. Niehaus, Esquire, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, California; Regina M. Ames, Esquire, Coughlin Stoia Geller Rudman & Robbins LLP, Los Angeles, California; Frank J. Johnson, Esquire, Johnson Bottini, LLP, San Diego, California; Dean T. Janis, Esquire, Janis Law Group, San Diego, California, Attorneys for the Plaintiffs.

David C. McBride, Esquire, Martin S. Lessner, Esquire, Christian Douglas Wright, Esquire, Kerrianne M. Fay, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Brad S. Karp, Esquire, Charles E. Davidow, Esquire, Michael E. Gertzman, Esquire,

Kristy M. Tillman, Esquire, Jonathan H. Hatch, Esquire, Paul Weiss Rifkind Wharton & Garrison LLP, New York, New York; Sean R. O'Brien, Esquire, Arkin Kaplan Rice LLP, New York, New York, Attorneys for the Defendants.

Henry A. Heiman, Esquire, Susan E. Kaufman, Esquire, Cooch and Taylor P.A., Wilmington, Delaware; Laurence M. Rosen, Esquire, Phillip Kim, Esquire, The Rosen Law Firm P.A., New York, New York; Kirk B. Hulett, Esquire, Blake Muir Harper, Esquire, Sarah P. Weber, Esquire, Hulett Harper Stewart LLP, San Diego, California, Attorneys for the Proposed Intervenors.

## OPINION

LAMB, Vice Chancellor.

In June of 2005, Citigroup or one of its affiliates formed MAT Five LLC, a fund created to invest in Municipal Opportunity Fund Five LLC ("MOF Five"). MOF Five was created to make economically leveraged investments in fixed-rate, tax-exempt municipal bonds. The various portfolios within MAT Five required a minimum investment of either $250,000 or $500,000 and shares in the portfolios were sold to over 1,000 high net worth investors. By February 2008, due in part to the weakening credit markets and a shift in the historical relationship between municipal bond rates and LIBOR swaps, MAT Five became insolvent and was unable to meet margin calls from its lenders. Shortly thereafter, Citigroup provided $246 million to keep MOF Five and its affiliated funds, including MAT Five, afloat.

In May of 2008, a lawsuit against the defendants in this action was filed in the U.S. District Court for the Southern District of New York alleging breaches of fiduciary duty and violations of Section 12(a)(2) of the Securities Exchange Act of 1933 stemming from the marketing and alleged mismanagement of MAT Five. A similar claim was also filed in California. Later that month, MAT Five commenced a tender offer to acquire its shares and sent its investors a memorandum describing the offer.

In June of 2008, the plaintiffs filed this action alleging, among other things, that the defendants breached their fiduciary duties by failing to disclose all material facts in connection with the tender offer and that the tender offer was unfair to MAT Five investors.

Following a preliminary injunction hearing in this court, the parties entered into settlement negotiations. These negotiations ultimately resulted in a stipulation of settlement, pursuant to which the defendants are now making an amended tender offer to MAT Five investors. This amended tender offer includes significant additional disclosures, additional monetary consideration and expanded choices for MAT Five investors.

Exercising its business judgment, the court now concludes that the proposed settlement is fair and reasonable. In reaching this conclusion, the court considers and overrules objections that were lodged. In light of the continued extreme volatility in the nation's credit markets, it is apparent that MAT Five investors should be free to choose, in accordance with the terms of the proposed settlement, whether to accept the benefits of the amended tender offer or, instead, pursue other remedies against the defendants. Accordingly, the proposed settlement will be approved.

### I.

A. *The Parties*

The plaintiffs in this action are Marie Raymond Revocable Trust (f/k/a Carl and Karen Schafer Revocable Trust) and Rich-

ard and Sharon Brower. Marie Raymond purchased shares in the MAT Five National portfolio and the Browers purchased shares in the MAT Five California portfolio.

Defendant MAT Five LLC has four portfolios: (1) the National portfolio; (2) the National II portfolio; (3) the New York portfolio; and (4) the California portfolio. Each portfolio invests in a corresponding portfolio issued by defendant MOF Five. MAT Five and MOF Five were each formed by defendant Citigroup or one of its affiliates on June 10, 2005 as Delaware limited liability companies. Also defendants in this action are Citigroup Alternative Investments LLC ("CAI"), Citigroup Fixed Income Alternatives LLC ("CFIA"), and Reaz Islam. CAI is an indirect subsidiary of Citigroup, manages numerous products on behalf of institutional and high net worth investors, acts as the investment manager of MAT Five, and manages MAT Five under the supervision and control of Citigroup. CFIA specializes in the identification, development and management of alternative fixed-income products, is a business unit of CAI, and assisted in the sale of MAT Five shares. Defendant Islam served as Managing Director and Senior Investment Officer of CAI and the Managing Director of CFIA. Islam managed the day-to-day operations of MAT Five on behalf of CAI and announced his resignation in May of 2008.

### B. *Background*

MAT Five was formed on June 10, 2005. MAT Five's National portfolios required a minimum investment of $500,000, while the California and New York portfolios each required a minimum investment of $250,000.[1] According to its June 17, 2005 Private Placement Memorandum, MAT Five's investment objective was "to generate attractive after-tax returns through investments in limited liability company interests" issued by MOF Five, "a fund that makes economically leveraged investments in fixed-rate, tax-exempt municipal bonds" and which "will seek to mitigate the accompanying interest rate risks through proprietary hedging strategies."[2]

Citigroup, through its affiliates including CAI and CFIA, began soliciting investors in late 2006. Eventually, more than 1,000 investors agreed to commit in excess of $800 million to the venture. Thus, capitalized, MAT Five began operations on February 14, 2007. For the quarter ending on June 30, 2007, MAT Five's National portfolio posted slightly negative returns. The situation worsened with movement in the ratio between municipal bond yields and taxable bond yields, due in part to the subprime credit crisis. MAT Five reported year-to-date returns of –9.5% on September 30, 2007 and –17.08% in December 30, 2007.

In early 2008, the losses increased dramatically due in part to a sharp shift in the ratio between municipal bond rates and LIBOR swaps.[3] By February 29, 2008,

---

**1.** For tax reasons, the California and New York portfolios invested in different bonds than the National portfolios, but the same basic investment strategy was employed uniformly across all of the MAT Five portfolios.

**2.** Private Placement Memorandum, MAT Five LLC, dated as of June 17, 2005 at i (the "MAT Five PPM"). The defendants also distributed a private placement memorandum for MOF

Five on June 17, 2005 which contained disclosures similar to the MAT Five PPM.

**3.** "[O]n February 29, 2008, 20–year AAA insured municipal bonds were yielding 51 basis points more than LIBOR swaps, with a ratio of 110.8% (5.27% AAA insured 20–year municipal bond versus 4.76% 20–year LIBOR swaps), which were the highest levels ever recorded and up from 96.6% only three days earlier. At that time, the historical average of

MOF Five was insolvent and unable to meet its margin calls from its lenders, including a Citigroup affiliate. Citigroup responded quickly and within the next three days distributed $246 million in cash to MOF Five to keep MOF Five and its affiliated funds, which included MAT Five, above water. The terms and conditions of the cash infusion had not been finalized at the time it was made. On March 20, 2008, the defendants sent a letter to investors which stated that the cash positions and net asset values of ASTA/MAT municipal arbitrage fund portfolios, which include MOF Five, had been severely affected by adverse conditions in the credit markets that spread into the municipal bond markets. The defendants informed investors that a cash infusion had been made to allow the fund to continue to operate.

In the ensuing period, Citigroup first determined that its investment would take the form of an equity infusion into MOF Five, priced at the net asset value of that entity at the time. This resulted in Citigroup becoming the owner of over 97% of the equity of MOF Five and the original investors (through MAT Five) becoming the owners of somewhat less than 3% of that equity. Following a series of internal discussions, Citigroup determined to make a number of concessions for the purpose of significantly improving the economics of the deal to the original investors. Among other things, Citigroup agreed to reallocate to the MOF Five shares owned by MAT Five 75% of the increase in value that Citigroup experienced between March

1 and April 30, as debt markets returned to a more normal condition. Citigroup also agreed that for periods after April 30, 2008, it would reallocate a significant portion of the interest income otherwise allocable to its shares in MOF Five to those owned by MAT Five. These reallocations substantially benefitted the original shareholders of MAT Five. Finally, Citigroup determined to fund a tender offer by MAT Five to acquire shares held by the original investors.

On May 1, 2008, a putative class action was filed against MAT Five, Citigroup, and Islam in the U.S. District Court for the Southern District of New York. The complaint in that case alleges breaches of fiduciary duty and violations of Section 12(a)(2) of the Securities Exchange Act of 1933. On June 23, 2008, another action was filed by additional investors making similar allegations. On July 9, 2009, that court appointed a lead plaintiff and consolidated those actions.[4] In California, another MAT Five investor filed a putative class action against the defendants in state court, also based in part on alleged violations of Section 12(a)(2).[5]

On May 29, 2008, MAT Five commenced its tender offer and sent investors a memorandum describing the offer. Pursuant to the tender offer memorandum, MAT Five offered investors the opportunity to tender shares in exchange for a cash payment equal to the April 30, 2008 NAV of those shares plus one new participation share for each share tendered.[6] The terms of the

---

this ratio was approximately 83% since 1994." Amended and Restated Confidential Tender and Exchange Offer Memorandum and Memorandum of Settlement, MAT Five LLC National Portfolio, November 2008 at 6.

**4.** *MAT Five Securities Litigation,* No. 08–4152 (S.D.N.Y.).

**5.** *Goodwill v. MAT Five LLC, et al.,* Civ. 474209 (Cal.Super.).

**6.** The participation share entitled the holder to receive: (1) the net interest income that would have been attributable to the tendering investor's shares tendered; and (2) upon liquidation of the MAT Five or other defined participation events, the investor's pro rata share of 75% of the excess of the aggregate

tender offer also required an investor who wished to participate to execute and deliver an unconditional release discharging any and all claims against the defendants and certain affiliated entities relating to or arising from the acquisition, disposition, or ownership of shares of MAT Five. The tender offer was set to expire on July 15, 2008.

The plaintiffs filed their complaint in this action on June 19, 2008 alleging, among other things, that the defendants breached their fiduciary duties to the plaintiffs and other investors by failing to disclose all material facts in connection with the tender offer. The complaint also alleged that the tender offer was unfair to MAT Five investors. On the same day the plaintiffs filed the complaint, they moved for expedited proceedings and a preliminary injunction. On June 26, 2006, this court granted the motion to expedite and scheduled a preliminary injunction hearing.

On July 15, 2008, the court held the preliminary injunction hearing. Without ruling on the motion, the court indicated that the disclosures in the tender offer memorandum appeared insufficient and that it would enjoin the transaction if the disclosures were not promptly supplemented. Shortly after the hearing, the defendants agreed to extend the expiration date of the tender offer and to supplement the disclosures. On August 7, 2008, the defendants sent the plaintiffs draft supplemental materials.[7] Unsatisfied by the defendants' amendments to the disclosure materials, the plaintiffs filed a second preliminary injunction motion. The court set an August 19, 2008 hearing date, which it later

canceled at the request of the parties who were then engaged in settlement negotiations.

On October 17, 2008, the parties entered into a memorandum of understanding, which set forth the primary terms of the settlement. The parties finalized the terms of the settlement and filed a stipulation setting forth those terms on November 10, 2008. At that time, the parties applied for an order conditionally certifying an opt-out class pursuant to Court of Chancery Rule 23(b)(3) and directing that notice be given of a hearing to be held on December 15, 2008 to consider whether or not to approve the settlement. As defined in the stipulation of settlement and the court's preliminary order of class certification, all those who serve as named plaintiffs in any other pending litigations and those who have already begun arbitration cases arising out of their MAT Five investment are excluded from the definition of the class and need take no further steps to preserve their right to continue to prosecute such other action.

In compliance with the court's preliminary order, the defendants delivered to investors the Notice of Pendency of Class Action, Proposed Settlement of Class Action, and Settlement Hearing (the "Notice") and the Amended and Restated Confidential Tender and Exchange Offer Memorandum and Subscription Agreement ("Amended Exchange OM") corresponding to each portfolio of MAT Five. The defendants sent the Notice and the Amended Exchange OM by overnight mail so that each investor would receive the

---

proceeds of the participation event minus the purchase price of Citigroup's shares in MOF Five plus the cost of capital.

7. The revised offer gave the defendants the right to void the participation shares if any court or other regulatory body invalidated any portion of the release. This provision was later removed from the offer.

materials at least 30 days before the settlement hearing.[8]

The principal components of the proposed settlement consist of substantially revised disclosures in the Amended Exchange OM and certain substantive changes to the tender offer itself. In short, instead of the original choice to tender or not, the settlement provides investors with four distinct options. These are summarized as follows:

*Option 1:* Tender and receive, in exchange for each MAT Five share held, (i) a cash payment equal to the July 31, 2008 NAV (which includes the Special Interest Allocation[9] and the Basic Interest Allocation[10] through the date such settlement NAV has been calculated);[11] (ii) a payment of $0.05 from Citigroup; and (iii) a new security of MAT Five (the "Interest Share") entitling the holder to retain the Special Interest Allocation and Basic Interest Allocation that would otherwise have been allocated to MAT Five share so exchanged from the date immediately following the date as of which the settlement NAV is calculated.

*Option 2:* Retain all MAT Five shares (which will be entitled to the Special Interest Allocation and the Basic Interest Allocation) until MAT Five resumes optional redemptions of Existing Shares, at which time such holders may elect redemption in exchange for the then-current NAV, inclusive of any Special Interest Allocation and Basic Interest Allocation up to the time of such redemption; and, in addition, receive a payment of $0.05 per share from Citigroup. Class members who make this election will not be entitled to any Interest Share, and the NAV of their Existing Shares will continue to be subject to gains and losses.

*Option 3:* Elect to receive the consideration offered in the original tender offer.

All persons who elect Options 1, 2, or 3 are required to provide a full release to the defendants and their related entities, broad enough to cover all claims that have been asserted in the New York federal action and the California state action.

*Option 4:* Opt out of the settlement. Holders who make this election will continue to hold their shares which will continue to be allocated the Special Interest Allocation and Basic Interest Allocation. Investors who opt out of the settlement will not be required to give a release and will be free to pursue whatever claims they have.

On November 21, 2008, the Michael Joel Stone Revocable Trust and Albeco, Inc. (together, "Stone") moved to intervene.

---

**8.** The deadline to opt out was December 5, 2008, giving investors at least 20 days from receipt of the materials to choose that option.

**9.** "Special Interest Allocation" means, for all periods starting May 1, 2008, the product of (i) the number of the holder's Existing Shares (or Participation Shares or Interest Shares, as applicable) divided by the baseline share count; and (ii) the sum of (A) 99% of the net interest income that would otherwise be allocable to the Citigroup MOF Shares from MOF Five's net interest income up to an amount corresponding to an interest income yield on the NAV of the Citi MOF Investment of two percent per annum (without compounding); and (B) 50% of the net interest income that would otherwise be allocable to the Citigroup MOF Shares from MOF Five's net interest income in excess of that amount.

**10.** "Basic Interest Allocation" means allocations of a portion of MAT Five's net interest, based on the baseline share count.

**11.** The parties agreed that the settlement NAV would be the higher of (i) the July 31, 2008 NAV or (ii) the last calculated month-end NAV prior to the date of Notice to the Class. Because the NAV as of July 31, 2008 was higher than the last calculated month-end NAV prior to the date the notice to the class was sent out, the settlement NAV equals the NAV as of July 31, 2008.

Stone is the lead plaintiff in the New York federal securities action. Five days later, Robert Whitson filed an objection to the settlement and the proposed award of attorneys' fees in this case.[12] Stone, Whitson, Daniel Smith[13] and Eric Goodwill[14] filed objections to the settlement. Stone and Goodwill opted out of the settlement, while Whitson and Smith did not.

This is the court's opinion denying the motion to intervene, overruling the objections, and approving the proposed settlement.

## II.

### A. *The Motion To Intervene*

▆ Stone, the plaintiff in the New York federal case against the defendants, seeks to intervene for the purpose of objecting to the settlement. The plaintiffs explicitly excluded Stone from the settlement class, but gave Stone the opportunity to opt in and join the class. Stone now seeks to object to the settlement without opting in and risking approval of the settlement, which would release its claims in New York and elsewhere. Stone's proposed intervention is not permitted under Delaware Court of Chancery Rule 24 and the relevant case law. Therefore, Stone's motion to intervene will be denied.

▆ Initially, Stone asserts that it should be able to intervene as of right under Court of Chancery Rule 24(a). Rule 24(a) provides:

(a) *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: (1) When a statute confers an unconditional right to intervene;[15] or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

In assessing a motion made pursuant to Rule 24(a)(2), the court must first determine if the applicant has an interest at risk in the litigation. Stone argues that the interests at risk are the rights of the New York federal plaintiffs and the putative class it represents. Stone claims these rights will be adversely affected without intervention. The court finds that this settlement does not effect Stone's interests. As a non-class member, Stone is free to pursue its claims in federal court or elsewhere. Additionally, the opt-out provision of the settlement allows all other investors to join Stone in pursuing those claims. In fact, the record reflects that a large number of investors, holding more than $100 million face value of shares, have chosen to do so.

Additionally, Stone appears to argue it should be allowed to intervene to inform the class of the strength of the federal claims. The plaintiffs' counsel in this case informed the class of the pending federal action and considered the value of the federal claims in reaching the proposed

---

12. Whitson invested $1 million in the MAT Five National portfolio. On November 26, 2008, Whitson requested the production of documents. The defendants provided Whitson with over 100,000 pages of documents by the date requested, December 3, 2008.

13. Smith invested $250,000 in the MAT Five California portfolio.

14. Goodwill is the named plaintiff a California state court lawsuit styled *Goodwill v. MAT Five LLC, et al.*, Civ. 474209 (Cal.Super.).

15. Stone does not argue that any statute confers a right for it to intervene in this case.

settlement. Stone has the burden to show that counsel's representation has been inadequate in this respect, but has not done so.[16]

■ In the alternative, Stone argues that the court should exercise its discretion and allow it to permissively intervene under Rule 24(b). Rule 24(b) provides:

> (b) *Permissive Intervention.* Upon timely application anyone may be permitted to intervene in an action: (1) When a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the Court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

While the federal action and this case have questions of law or fact in common, allowing intervention at this late date would unduly delay this action and prejudice those investors who wish to accept the tender offer and, thus, support the settlement. The parties have labored for months to craft a resolution to this dispute and any delay would risk the unraveling of a settlement that provides substantial benefits to the investors.[17] Additionally, if the tender offer is not able to close before the end of the year, investors could be prejudiced by the delay in receiving the tax benefits attendant to the settlement. Accordingly, the court will not exercise its discretion to allow intervention by Stone.

In any event, the denial of Stone's motion to intervene is of little consequence. Stone wishes to intervene in order to object to the settlement. Stone shares counsel with other objectors to the proposed settlement, and its arguments are largely duplicative of the other objectors' arguments. Therefore, the essence of Stone's objections have been considered by the court in the course of evaluating the settlement.

## B. Class Certification: Rule 23(a)

In approving this settlement, the court must decide whether this action may be maintained as a class action under Court of Chancery Rule 23.[18] Rule 23(a) allows a representative to sue on behalf of a class only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The first and second requirements in Rule 23(a) focus on the characteristics of the proposed class, while the third and forth

---

**16.** *Wion v. Nat'l Recreation Prods., Inc.,* 1980 WL 268059 at *2 (Del.Ch. Dec.5, 1980).

**17.** Federal courts, interpreting the federal counterpart to Rule 24(b), have found that the risk of unraveling a stipulation of settlement sufficient grounds to deny permissive intervention due to the potential for "undue prejudice" to the existing parties. *See, e.g., Empire Blue Cross & Blue Shield v. Janet Greeson's A Place for Us, Inc.,* 62 F.3d 1217, 1220 (9th Cir.1995); *Orange County v. Air California,* 799 F.2d 535, 538 (9th Cir.1986); *Scardelletti*

*v. Debarr,* 265 F.3d 195, 204 (4th Cir.2001), *rev'd on other grounds sub nom, Devlin v. Scardelletti,* 536 U.S. 1, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002). Decisions which interpret the Federal Rules of Civil Procedure are "usually of great persuasive weight in the construction of parallel Delaware [Court of Chancery] rules." *Cede & Co. v. Technicolor, Inc.,* 542 A.2d 1182, 1191 n. 11 (Del.1988).

**18.** *See Prezant v. De Angelis,* 636 A.2d 915, 920–24 (Del.1994).

requirements focus on the characteristics of the proposed class representative.

### 1. *Numerosity*

■ There is no precise cutoff under the numerosity requirement, but "numbers in the proposed class in excess of forty, and particularly in excess of one hundred, have sustained the numerosity requirement." [19] The test is not whether joinder of all the putative class members would be impossible, but whether joinder would be practical.[20] A showing of "strong litigational inconvenience" in the prosecution of claims by the proposed class members is sufficient.[21] The affidavit of Marie Noble, associate general counsel of CAI, indicates that there were 1,082 notices mailed to class members.[22] Classes of far fewer than 1,082 potential members have satisfied the numerosity requirement.[23] The court sees no reason for a different result here and holds that the joinder over 1,000 members would be impracticable in this case.

### 2. *Commonality*

■ Next the court must determine whether common questions of law or fact exist. The commonality requirement of Rule 23(a) is satisfied "where the question

of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." [24] The plaintiffs in this case allege injuries to all investors in the various MAT Five portfolios stemming from a common course of action by the defendants, including an alleged breach of the defendants' fiduciary duties owed to the class in connection with the original exchange offer. This is sufficient to meet the commonality requirement.

### 3. *Typicality*

■ The typicality requirement mandates that "the legal and factual position of the class representative must not be markedly different from that of the members of the class." [25] Here, the plaintiffs, like all class members, are investors in one or more MAT Five portfolios. As side-by-side investors in the MAT Five portfolios, the claims and defenses of both the plaintiffs and the class arise from the same legal and factual foundation.[26] Therefore, the plaintiffs meet the typicality requirement.

### 4. *Adequacy*

■ Finally, the court must determine that the representative plaintiffs will fairly

---

19. *Smith v. Hercules, Inc.*, 2003 WL 1580603, at *4 (Del.Super.Jan.31, 2003); *see also, Leon N. Weiner & Assocs., Inc. v. Krapf,* 584 A.2d 1220, 1225 (Del.1991), *rev'd on other grounds,* 623 A.2d 1085 (Del.1993); *Eisenberg v. Gagnon,* 766 F.2d 770, 785–86 (3d Cir.1985). "Chancery Court Rule 23 is almost identical to Rule 23 of the Federal Rules of Civil Procedure. Accordingly, in construing Chancery Court Rule 23, we find persuasive authority in . . . the interpretation of that rule by the federal courts." *Nottingham Partners v. Dana,* 564 A.2d 1089, 1094 (Del.1989).

20. *Weiner,* 584 A.2d at 1225.

21. *Id.* (citations and quotations omitted).

22. Noble Aff. 3.

23. *See, e.g., Smith,* 2003 WL 1580603, at *5 (approving a class of 106 members); *Weiner,* 584 A.2d at 1225 (approving a class of 203 members); *Eisenberg,* 766 F.2d at 785–86 (approving a class of 90 members).

24. *Weiner,* 584 A.2d at 1225.

25. *Id.*

26. Although apparently the named plaintiffs in this action did not invest in the MAT Five New York portfolio, the claims and defenses available to the investors in that portfolio appear to mirror those available to investors in the other MAT Five portfolios in which the plaintiffs did invest.

and adequately protect the interests of the class. No conflicts of interest appear to exist between the representative plaintiffs and the other class members. Additionally, the plaintiffs have retained competent counsel, experienced in class and corporate litigation. For those reasons, and without any substantiated argument to the contrary, the court finds the representative plaintiffs to be adequate class representatives.[27]

### C. Class Certification: Rule 23(b)(3)

▮ In addition to the requirements set forth in Rule 23(a), the action must fall into one of the three categories in Rule 23(b) to be properly certified as a class action. The plaintiffs propose certification under Rule 23(b)(3) that requires a finding "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [28] The questions of law and fact shared by the class clearly predominate over any individual concerns. As the investors in the MAT Five portfolios, the class members all received the same tender offer disclosure materials and all are facing a common tender and exchange offer decision. Rule 23(b)(3) is sometimes referred to as a "damage class action" and is often used in "those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." [29] This is such a case. A class action is a far superior method of resolution than the potential 1,082 separate lawsuits or the unwieldy joinder of the vast number of potential plaintiffs in this action.

If a class action is certified pursuant to Rule 23(b)(3), the class members must be given the best notice practicable under the circumstances, the opportunity to be heard and, in addition, the right to opt out.[30] Here, the defendants complied with these requirements through the mailing on or about November 13, 2008 which included the best notice practicable under the circumstances and informed the class members of their right to be heard and to opt out of the settlement.[31] Thus, this action satisfies the requirements for certification under Rule 23(b).

### III.

### A. The Legal Standard For Approving A Class Action Settlement

▮ Rule 23(e) requires that the court approve class action settlements. There is no requirement that the court

---

27. See Hoffman Elec., Inc. v. Emerson Elec. Co., 754 F.Supp. 1070, 1076 (W.D.Pa.1991).

28. See Nottingham Partners, 564 A.2d at 1096.

29. Id.

30. Ch. Ct. R. 23(c)(2); see also In re MCA, Inc. S'holder Litig., 785 A.2d 625, 635 (Del. 2001) ("In addition to adequate representation, absent class members must be afforded notice, an opportunity to be heard, and a right to opt out in order to be bound by a settlement."). The source of these rights appears to be the Due Process Clause of the United States Constitution. See, e.g., Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (Holding that due process requires notice, an opportunity to be heard, and the right to opt out of a damages based class action settlement).

31. Certain objectors dispute whether they were provided with a full and fair opportunity to opt out. This contention is addressed below.

hold a trial as to the issues.[32] However, approval of a class action settlement requires more than a cursory scrutiny of the issues by the court.[33] The court fulfills its duty under Rule 23 by exercising its sound business judgment in weighing and considering "the nature of the claim, the possible defenses to it, [and] the legal and factual obstacles facing the plaintiff in the event of trial."[34] In considering the proposed settlement of a class action, the court must determine whether the settlement is fair and reasonable.[35] The proponent of the settlement has the burden of showing the fairness of the proposed settlement.[36]

 It is well established that Delaware law favors the voluntary settlement of contested issues.[37] Settlements are encouraged because they promote judicial economy and because the litigants are generally in the best position to evaluate the strengths and weaknesses of their case.[38] For the reasons set forth below, including the significantly improved disclosures, the increased monetary consideration and the expanded range of options offered by the proposed settlement, the court finds the proposed settlement fair and reasonable.

### B. *Analysis Of The Proposed Settlement*

The settlement resolves all claims arising from the acquisition, disposition, or ownership of shares of MAT Five, therefore the court will analyze the potential value of those claims against the value of the settlement.

### 1. *The Delaware Action*

The focal point of the Delaware action was the claim that the defendants provided insufficient disclosures in the original tender offer. The record in this case weighed strongly in favor of the plaintiffs' contention that the initial disclosures were inadequate. The typical remedy in such a case would be injunctive relief requiring the defendants to make more fulsome disclosures. As a result of the plaintiffs' efforts, substantial additional disclosures have already been achieved. Whether further litigation could lead to even greater added disclosure is unknown, but it appears that all of the most glaring defects in the tender offer documents have been corrected. In addition, the monetary value of the tender offer has also been improved.

### 2. *The New York Action, The California Action, And Potential Claims*

The objectors argue that actions outside of Delaware, based on the marketing and alleged mismanagement of the fund, could result in the return of 100% of the investors' initial investment. While this may be true in theory, it is also true that as of the date of the settlement hearing no class had yet been certified and no complaint had been tested in those cases. Additionally, the plaintiffs submit that they analyzed the

**32.** *Rome v. Archer,* 197 A.2d 49, 53 (Del. 1964).

**33.** *Id.*

**34.** *Id.*

**35.** *See, e.g., Nottingham Partners,* 564 A.2d at 1102; *Polk v. Good,* 507 A.2d 531, 536 (Del. 1986); *Geller v. Tabas,* 462 A.2d 1078, 1082 (Del.1983); *Krinsky v. Helfand,* 156 A.2d 90, 94 (Del.1959).

**36.** *In re TD S'holders Litig.,* 938 A.2d 654, 657 n. 4 (Del.Ch.2007).

**37.** *See, e.g., Kahn v. Sullivan,* 594 A.2d 48 (Del.1991); *Nottingham Partners,* 564 A.2d at 1102; *Rome,* 197 A.2d at 53–54; *Braun v. Fleming–Hall Tobacco Co.,* 92 A.2d 302, 309– 10 (Del.1952).

**38.** *See Prezant v. De Angelis,* 636 A.2d 915, 923 (Del.1994); *In re Ortiz Estate,* 27 A.2d 368, 374 (Del.1942).

outstanding claims in other jurisdictions and raise doubt as to the viability of those claims.[39] At the very least, the plaintiffs have shown that recovery of 100% of the investors' initial investment is by no means certain and that any additional recovery would undoubtedly require the devotion of substantial additional time and money. More likely, as discussed at note 39, the New York federal claims (and other claims asserted under Section 12(a)(2) of the Securities Act) face substantial obstacles to a full recovery.

### 3. The Benefits Of The Settlement

The settlement provides investors with substantial additional disclosures, material additional monetary compensation, and a range of options from which to choose. As a result of the settlement, the defendants made supplemental disclosures in the Amended Exchange OM. These disclosures include: (1) additional information regarding the scope and focus of the SEC investigation into the MAT Five funds; (2) a revised definition of the term "Leverage" used in the original tender offer materials, which differed from the definition used in the MAT Five PPM; (3) an accurate and updated NAV of MAT Five shares; (4) additional facts regarding the claims subject to the release, including the terms pursuant to which Citigroup made its cash infusion into the MAT Five Funds, why the cash infusion was necessary, and that the terms of the infusion were not established until long after it was made; (5) the nature and status of the material cases pending against the defendants; (6) additional information regarding the background and purpose of the tender offer; (7) that resuming redemptions and achieving target leverage were contingent on obtaining satisfactory liquidity financing that had not yet been agreed upon by the lenders; (8) that redemptions would not recommence prior to completion of the liquidation of MAT Five; and (9) identification of an error in the allocation analysis in the tender offer memo.

The settlement also provides for material cash payments, which would not have been otherwise available to investors. The settlement provides investors with four options. Simplistically, Option 1, the default option, entitles investors to receive in exchange for each of their shares: $0.05,[40] a

---

**39.** The objectors focus their argument on the claim alleged in the New York federal action predicated on section 12(a)(2)of the Securities Act of 1933. They argue that success on that claim could result in the award of rescissory damages equal to investors' entire initial investment. The plaintiffs argue that the Section 12(a)(2) claim is not viable because the securities at issue were not sold pursuant to a prospectus as defined in the Securities Act, but rather through private transactions with accredited investors. See Gustafson v. Alloyd Co., 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); 15 U.S.C. 77b(a)(15); 17 CFR 230.215. Additionally, the plaintiffs argue that the federal claims have major class certification issues because the individual issues would predominate over common issues. According to the plaintiffs, the federal claims regarding the marketing of the funds would turn on individual inquiries into "oral representations made by hundreds of investment advisors to thousands of investors," which would frustrate class certification attempts and therefore likely increase an investor's individual litigation costs. Pls.' Br. in Support of Proposed Settlement and Application of Att'ys' Fees and Expenses 27. Objectors challenge the plaintiffs' contentions regarding the strength of the federal case, but in any event, the plaintiffs have convinced this court that investors would likely face substantial obstacles and costs in pursuing their claims related to the marketing and management of the funds.

**40.** Five cents per share is equal to 5% of the investors initial investment and would be $25,000 for the investor who invested the minimum of $500,000 in a MAT Five National portfolio.

cash payment equal to the July 31, 2008 NAV,[41] and an interest share that gives investors the opportunity to share in the upside of the fund going forward. In total, Option 1 entitles investor in the National portfolio, for example, to a total cash payment $0.289 or 28.9% of their initial investment.[42] Due to the interest share, the defendants estimate the total value of Option 1 for the National portfolio investor to be between 32.6% and 33.8% of the initial value after one year, depending on leverage. Option 2 allows investors to keep their existing shares and receive $0.05 per share. Option 3 allows investors to exchange their shares according to the terms of the original tender offer, which includes the April 30, 2008 NAV and a participation share.[43] Across all of the portfolios, under the base case at 4 times leverage, Option 1 provides investors with a collective benefit of over $39 million more than the original tender offer.[44] Options 1, 2, and 3 all require the investor to sign a release. Option 4 allows investors to opt out of the settlement and avoid giving a release.

Investors who chose to participate in the original tender offer and elected the early settlement option, but who now wish to opt out in order to pursue other remedies, must return the early settlement cash payment (and receive back their shares) in accordance with the terms of the original tender offer.

### 4. Analysis Of The Fairness And Reasonableness Of The Settlement

Weighing the value of the settlement against the release of the potential claims (and considering the obstacles standing in the way of those claims) the court, exercising its business judgment, determines that the settlement is fair and reasonable.[45] In exchange for the settlement consideration, the class members who do not opt out are surrendering their claims against the defendants. A final resolution of this action could possibly have resulted in additional disclosures,[46] but the settlement provided all additional disclosures demanded by the plaintiffs. Additionally, investors seeking to rescind their earlier tender in response to the original tender offer are effectively given the right to do so by opting out. Moreover, claims related to the marketing

---

**41.** The July 31, 2008 NAV of the National, National II, California, and New York portfolios is $0.239, $0.235, $0.209, and $0.336, respectively.

**42.** The cash payment to investors in the National, National II, California, and New York portfolios under Option 1 will be $0.289, $0.285, $0.259, and $0.386 per share, respectively.

**43.** The April 30, 2008 NAV is approximately one to three cents per share lower than the July 31, NAV, depending on the portfolio. Amended and Restated Confidential Tender and Exchange Offer Memorandum and Memorandum of Settlement, November 2008, Annex A.

**44.** Pls.' Br. in Support of Proposed Settlement and Application of Att'ys' Fees and Expenses 21.

**45.** Rome, 197 A.2d at 53–54. Objectors cite Barkan v. Amsted Indus., Inc., 567 A.2d 1279, 1284–85 (Del.1989) for the proposition that the court should not approve a settlement where the plaintiff is asked to give up a facially valid claim for a small consideration. In the context of this settlement, it is obvious that the consideration is substantial.

**46.** Delaware courts have long recognized the value of meaningful and timely disclosure. See, e.g., In re Talley Indus., Inc. S'holders Litig., 1998 WL 191939, at *15 (Del.Ch. Apr.13, 1998) ("Indeed, the timely disclosure of the information in the supplement was presumably of greater value to the class than any potential award of damages based on the failure to disclose the same information, as such information is of the greatest utility when it is available in a timely manner to inform the stockholders' decision making process.").

and alleged mismanagement of MAT Five could possibly produce greater financial results than the settlement, but those claims face legal and financial obstacles of uncertain dimension. Nevertheless, the opt-out feature of the settlement gives investors who wish to pursue those claims the ability to do so.

The court finds it reasonable that some investors would choose the economic benefits immediately available under the settlement, rather than risk uncertain litigation and the possibility of a further loss on their investment. In this regard, the court notes that between August and September of 2008, while settlement negotiations were ongoing, the MAT Five portfolios sustained additional material losses when the ratio between municipal bonds and LIBOR swaps spiked again—this time to over 140%. To put this movement into perspective, the market incident in February of 2008 that nearly led to the total collapse of the MAT Five portfolios caused that ratio to spike at 110.8%. While the portfolios were evidently better situated to sustain the volatility the second time around, they did sustain losses, and there is no guarantee that even greater losses will not occur in the future. For this added reason, the court is loath to deny those class members—accounting for more than 80% of shares—who have chosen to participate in

the settlement the opportunity to do so now.

Class members representing 14.8% of the shares exercised their right to opt out, a percentage that suggests both the appeal of the settlement (given the large majority who do not choose to opt out) and the viability of the opt-out feature.[47] Importantly, all of the MAT Five investors are high net worth individuals, presumably with access to financial and legal advisors.[48] The settlement provides the investors with the information and opportunity to make an informed decision between fair and reasonable options. Some of these sophisticated investors may see great value in the claims against MAT Five and choose to opt out in order to pursue those claims in New York or elsewhere. Others may prefer to sell their shares in exchange for a payment of 28.9%–38.6% of their initial investment, depending on portfolio, as offered by the defendants.[49] That both options are available and both have been utilized is strong evidence of the fairness of the settlement.

## IV.

### A. *Objections* [50]

Only two objections to the proposed settlement were filed, one by counsel in the New York action and one by counsel in the California action. Counsel in the New

47. Holders of another 4%–5% were excluded from the definition of the class (with a right to opt in).

48. The court in the pending MAT Five federal action in New York, recognized in denying a motion for the partial lifting of the automatic stay under the Private Securities Litigation Reform Act (the "PSLRA") that, given proper disclosures, these high net worth investors would likely have advisors to aid them in evaluating the best option for them. "As noted at the outset, the investors in this hedge fund were high net worth individuals who presumably have access to advisers who can assist them in deciding whether receiving a percentage of their money today is worth

more to them than awaiting a possible return in the future from a case in which no class has yet been certified and in which the sufficiency of the complaint has yet to be tested." *In re MAT Five Sec. Litig.*, 2008 WL 3539887, at *2 (S.D.N.Y., Aug.12, 2008).

49. These percentages do not include the interest share.

50. To extent the objectors challenge the fairness and reasonableness of the settlement, those objections are dealt with above. The objectors also contend that the notice sent in this action does not comply with the PSLRA. However, as Judge Buchwald recognized,

York action filed his objection on behalf of Roger Whitson, Daniel Smith, and proposed intervenor Stone. Counsel in the California action filed his objection on behalf of Eric Goodwill, the named plaintiff in the California action. Both Stone and Goodwill were excluded from the class, did not choose to opt into the class, and will not have their rights effected by the settlement. Thus, they do not have standing to object.[51] Nonetheless, the arguments made on behalf of Whitson and Smith, both members of the class, are largely the same as the arguments made by Stone and Goodwill and will be addressed by the court.[52]

### 1. Breadth Of The Release

■■■■■■ The objectors argue that the release is overly broad because it encompasses the federal securities claims currently pending in New York.[53] On the facts of this case, the court cannot agree that the release required of those who choose to participate in the tender offer is unduly or improperly broad. The Delaware Court of Chancery "has a history of approving settlements that have implicitly or explicitly included a general release, which would also release federal claims."[54] The Court of Chancery "may enter a judgment in connection with the settlement of [litigation] that results in the release of both state law claims and exclusively federal claims if the claims arise from the same factual predicate, even if the state court could not dismiss or adjudicate the federal claims."[55] The objectors rely heavily on

"[t]he suggestion that any settlement offer at this stage must comply in all respects with the PSLRA ... would be wholly impracticable and would prevent the early settlement of any case commenced with citation to the PSLRA." *MAT Five*, 2008 WL 3539887, at *1 (S.D.N.Y. Aug.12, 2008).

51. *See, e.g., Lehman v. BAV Liquidating Corp.*, 1982 WL 17834, at *1 (Del.Ch. June 24, 1982) (holding that persons with no stake in a proceeding do not have standing to object).

52. Stone and Goodwill make the argument (which is not made by other objectors) that the stipulation of settlement wrongfully excluded from the class person who are acting as named plaintiffs in other pending suits or arbitrations in order to hamper those persons' ability to object. The parties explained at the settlement hearing that investors currently involved in litigation or arbitration against MAT Five outside of this action were excluded from the class definition so that they did not need to opt out in order to protect their ability to maintain such other action. Those investors had obviously chosen to pursue other means of resolution and plaintiffs' counsel logically explained that the parties did not want those individuals to inadvertently release their rights by failing to affirmatively opt out of the class. However, those investors, including Stone and Goodwill, were given the opportunity to opt in and become a part of the class. At least one such investor who had been involved in arbitration, and thus originally excluded, chose to opt into the settlement class.

53. While the objectors focus on the New York action, and not the California action, the same rationale discussed in this section also applies to the California action, which is included in the release as well.

54. *See Nottingham Partners*, 564 A.2d at 1105; *see also Tabas v. Crosby*, 1982 WL 17835, at *1–*2 (Del.Ch. June 24, 1982) (approving settlement where there were competing claims in federal court that would be released).

55. *In re MCA, Inc.*, 598 A.2d 687, 691 (Del. Ch.1991); *see also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996), where the Supreme Court addressed the release of exclusively federal claims by state courts and held: "[w]hile § 27 [the provision that gives federal courts exclusive jurisdiction over Exchange Act Claims] prohibits state courts from adjudicating claims under the Exchange Act, it does not prohibit state courts from approving the release of Exchange Act claims in the settlement of suits over which they have properly exercised jurisdiction." Here, this court clearly

the recent decision in *Off v. Ross*.[56] *Off*, the objectors argue, stands for the proposition that settlements that effect pending cases are invalid. However, the court in *Off* disapproved the settlement primarily based on the inadequacy of the consideration, which was arguably non-existent in that case.[57] Additionally and importantly, *Off*, unlike this action, involved a non-opt-out class. Therefore, in contrast to this case, the plaintiffs in the companion federal case in *Off* had no opportunity to opt out of the settlement. While the federal litigation was carved out of the release in *Off*, the court noted that the settlement could have a negative effect on that litigation. Here, unlike *Off*, the named plaintiffs in the federal action are not members of the class, and their rights remain fully intact. Moreover, the record reflects that the holders of more than $115 million in face value of MAT Five shares have opted out of the settlement. This is obviously a large enough potential dollar pool to make prosecution of the federal class action realistically possible.

The objectors argue that Judge Naomi Buchwald of the U.S. District Court for the Southern District of New York has vested their "counsel in the federal action with the authority to litigate and resolve the federal claims under the PSLRA, including the authority to initiate and conduct all settlement negotiations" in support of their argument that the release is overly broad.[58] The objectors suggest that the grant of this authority prevents the plaintiffs and their fellow class members from entering into a release that includes the federal action. However, Judge Buchwald found to the contrary, writing that:

> To the extent that Rule 23 gives a court authority to issue orders to "protect class members and fairly conduct the action" we have concluded that there is no need to duplicate active efforts of the Delaware Chancery Court. Having examined Rule 23 and the PSLRA, which plaintiff's counsel relies upon to suggest that this Court has interest separate and distinct from the class action plaintiff and the court in Delaware, we reject plaintiff's counsel's argument. The interest is the same: an informed class. Finally, we note that there is no separate interest on the Court's part to prevent a putative class member from accepting the tender offer if it meets fair disclosure standards.[59]

Accordingly, nothing in the law or Judge Buchwald's opinion appears to hinder the class members from entering into a release that includes the federal action.

### 2. *Due Process Concerns*

■ Citing *Phillips Petroleum Co. v. Shutts*,[60] the objectors argue that the settlement agreement improperly requires those class members (such as Whitson) who have already tendered under the original tender offer, and who elected to receive payment for their shares under the early settlement option made available pursuant to that offer, to materially alter their legal position in order to opt out of

---

and undisputedly has jurisdiction over the Delaware action.

**56.** 2008 WL 5053448 (Del.Ch. Nov.26, 2008).

**57.** *Off v. Ross*, 2008 WL 5053448, at *7–14 (Del.Ch. Nov.26, 2008).

**58.** Objection of Roger Whitson, Daniel Smith, and Intervenors the Michael Joel Store Revo-

cable Trust and Albeco, Inc. to class Certification, Settlement and Award of Att'ys' Fees at 17.

**59.** *In re MAT Five Sec. Litig.*, 2008 WL 3539887, at *2–*3 (S.D.N.Y. Aug.12, 2008).

**60.** 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

the settlement. *Shutts*, the objectors claim, stands for the proposition that due process requires an opportunity to opt out of a Rule 23(b)(3) class action and that an investor cannot be forced to incur legal detriment to do so.[61] By requiring investors (such as Whitson), who tendered early but now wish to opt out, to return the monies earlier paid to them, objectors contend, the settlement deprives those investors of a real opportunity to opt out of the settlement.[62] Counsel for the objectors states that Whitson wishes both to keep the early settlement proceeds *and* to opt out of the settlement in order to sue the defendants. Apparently, Whitson plans to argue that the release he gave when he tendered his shares is invalid due to the material inadequacies in the original tender offer disclosures.

The short answer is that Whitson cannot have it both ways. The original tender offer clearly stated that if an investor wanted to revoke her tender *or* if Citigroup terminated the tender offer (which it retained the right to do at any time for any reason), an investor who tendered pursuant to that offer would be required to return any funds already paid.[63] Accordingly, Whitson never had a reasonable expectation that he would be able to both keep the proceeds *and* pursue the claims he was required to release. *Shutts* simply requires the opportunity to opt out without requiring the relinquishment of anything of value.[64] The revised terms of the tender offer embodied in the proposed settlement satisfy this requirement.

### 3. Representations And Warranties In The Release

 The objectors also dispute the validity of a provision in the release that they claim requires them to represent that they performed an independent investigation into the defendants' conduct. The objectors contend that this is a representation they could not possibly make because of the defendants' dilatory response to the objectors' attempt to perform such an investigation. Quite the contrary, the defendants made available to the objectors the materials they requested precisely by the deadline set by the objectors themselves. Also the objectors incorrectly argue that the release improperly *requires* them to consult with their investment advisors.

---

**61.** *Id.* ("We hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out'. . . .").

**62.** The following percentage of shares were tendered and paid pursuant to the original tender offer: 37.5% of the National portfolio, 19.1% of the National II portfolio, 35.0% of the California portfolio, and 55.2% of the New York portfolio.

**63.** Confidential Tender and Exchange Offer Memorandum, MAT Five LLC, National Portfolio, dated as of May 29, 2008 at iii (first bullet point), 23–24. ("If we [Citigroup] terminate or revoke the Exchange Offer, Participation Shares issued pursuant to Early Settlement will be rescinded and an equal number of Existing Shares will be recredited to each applicable Existing Holder's account, on the books and records of the Company, and each such Existing Holder will be required to return all Exchange Payment previously received.") *Id.* at 27.

**64.** The objectors claim that the fact that only two investors who had originally tendered either commenced arbitration (and thus were excluded from the class) or opted out of the amended tender offer supports their claim that investors such as Whitson were not given a real choice. The court is not persuaded. Those investors who elected early settlement were likely be those investors most eager to exit the MAT Five portfolios and receive their cash payment. A low likelihood exists that these same investors would subsequently choose to opt out of the settlement, especially considering the additional consideration provided in the amended tender offer.

The release merely requires that the class member acknowledge that he/she has "carefully considered and has, to the extent Subscriber believes necessary, discussed with Subscriber's advisers" his, her or its options with respect to the settlement.[65] These representations in the release are not improper. Indeed, such representations are typically required in transmittal letters associated with tender offers.

#### 4. Time Frame To Opt Out And Time To Choose Between Options

■ The objectors argue that 20 days to determine whether to opt out of the settlement is too short a time. However, the only case the objectors cite indicates that the general practice of the Court of Chancery is to provide notice to class members between 30 and 45 days prior to the settlement hearing.[66] The notice in this case was mailed within that range—30 days prior to the settlement hearing. Moreover, in contrast to the situation in notifying classes of proposed settlements, the defendants knew the addresses of all class members and the notice was sent by overnight mail. The notice delivery also did not have to be facilitated by a brokerage houses holding stock in street name for an individual shareholder, thereby avoiding delay in the notice process. Additionally, the class members all had a significant stake in one or more of the MAT Five portfolio, which would likely command their immediate attention and prompt a rapid response. Moreover, as mentioned, these investors were all high net worth individuals who presumably had advisors to assist them in quickly making an informed decision. Under these circumstances, 20 days to determine whether to opt out and 30 days to determine which other option to choose is sufficient.

#### B. Attorneys' Fees

■ The plaintiffs' counsel are applying for $5 million in attorneys' fees and expenses in connection with the prosecution of this action. Subject to final approval of the settlement, CGI Private Equity LP LLC, on behalf of the defendants, has agreed to pay the requested $5 million in fees and expenses separate and apart from the settlement consideration discussed above. The court will approve the fee application and finds the fees fair and reasonable under the circumstances.[67]

■ The principal factors for the court to consider in determining fee allowances in shareholder actions are: (1) the benefits achieved in the action; (2) the efforts of counsel and the time spent in connection with the case; (3) the contingent nature of the fee; (4) the difficulty of the litigation; and (5) the standing and ability of counsel.[68] In Delaware, the benefits achieved in the actions receives the greatest weight in determining the fee award.[69] Here, as a result of the settlement, MAT Five's shareholders received substantial additional disclosures and significant monetary consideration as part of the amended tender offer. The actual upfront cash benefit to be paid to those investors who chose Option 1 is over $38 million greater than they would have re-

---

65. MAT Five LLC Settlement and Subscription Agreement 2008 at 7.

66. *In re Coleman Co. S'holders Litig.,* 750 A.2d 1202, 1210 (Del. Ch.1990).

67. *Krinsky,* 156 A.2d at 90–95.

68. *See, e.g., Sugarland Indus., Inc. v. Thomas,* 420 A.2d at 149–50 (Del.1980); *Swacker v. Pennroad Corp.,* 57 A.2d 63, 69 (Del.1947).

69. *See, e.g., Sugarland Indus.,* 420 A.2d at 152.

ceived under the original tender offer. Looking only at this piece of the settlement,[70] the fee request represents less than 14% of benefit achieved. This court has often approved fee requests of 30% or more of the benefits where the settlement benefits are attributable solely to the litigation.[71] The defendants admit that the plaintiffs were solely responsible for the additional disclosures and the revised terms of the tender offer. Also weighing in favor of the fee award is the contingent nature counsel's engagement.[72] Moreover, the efforts of counsel were significant, including the review of well over 100,000 documents, preparing for and conducting or defending multiple depositions, and the preparation of numerous motions and briefs. The plaintiffs' counsel spent nearly 3,000 hours of time and nearly $50,000 in costs and expenses in connection with these activities. Finally, the standing and ability of counsel also weigh in favor of the fee award. For the reasons above, the fee award of $5 million will be approved.

### V.

For the foregoing reasons, the motion to intervene is DENIED and the objections to the proposed settlement are OVERRULED. The court has today entered the form of Order and Final Judgment contemplated by the Stipulation of Settlement.

70. Counsel obtained much more than the $38 million cash benefit, including substantial additional disclosures, multiple options for investors, and the interest share.

71. *See, e.g., In re Intek Global Corp. S'holders Litig.*, C.A. No. 17207 (Del. Ch. Apr. 24, 2000) [Order]; *In re Home Shopping Network, Inc. S'holder Litig.*, Cons.C.A. No. 12868, Chandler, V.C. (Del. Ch. Jan. 24, 1995) [Order]; *In re USA Cafes, L.P. Litig.*, Cons. C.A. No. 11146, Jacobs, V.C. (Del. Ch. June 22, 1994) [Order]; *Wiegand v. Berry Petroleum Co.*, C.A. No. 9316, Jacobs, V.C. (Del. Ch. Nov. 25, 1991) [Order]; *In re Corporate Software, Inc. S'holder Litig.*, Cons.C.A. No. 13209, Allen, C.

(Del. Ch. Nov. 15, 1994) [Order]; *In re Berkshire Realty Co., Inc. S'holder Litig.*, C.A. No. 17242, Chandler, C. (Del. Ch. Aug. 10, 2004) [Order]; *In re UnitedGlobalCom, Inc. S'holders Litig.*, Cons.C.A. No. 1012–VCS, 2008 WL 2914647 (Del. Ch. May 16, 2008) [Order]. All the above cases approved fee awards of at least 30%.

72. *See, e.g., Chrysler*, 223 A.2d at 389; *Dow Jones & Co. v. Shields*, 1992 WL 44907, at *2 (Del.Ch.); *In re Plains Res. Inc. S'holders Litig.*, 2005 WL 332811, at *6 (Del.Ch.2005).